SEALED

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
## CIVIL DIVISION

FILED by ____ D.C.

NOV 1 5 2010

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

UNITED STATES OF AMERICA
ex rel.
MICHAEL REILLY, M.D.,

Relator,                                    **10-60590-Cv-Martinez/Brown**

vs.

**TO BE FILED IN**
**CAMERA AND UNDER SEAL**
DO NOT PUT IN PRESS BOX

DO NOT ENTER ON PACER

NORTH BROWARD HOSPITAL
DISTRICT d/b/a BROWARD HEALTH,
BROWARD GENERAL MEDICAL CENTER,
AND JOHN DOES 1-100

Defendants.

## RELATOR'S FIRST AMENDED COMPLAINT UNDER
## FEDERAL FALSE CLAIMS ACT

Introduction ................................................................................................ 2

Parties ....................................................................................................... 5

Jurisdiction and Venue ................................................................................ 6

Introduction to Federal Stark Laws .............................................................. 8

The Stark Statute's Broad Definition of "Referral" ....................................... 10

The Anti-Kickback Statute Also Mandates that A Hospital's Compensation
to an Employed Physician May Not Take Into Account the Volume or Value
of Referrals to the Hospital ......................................................................... 14

Introduction to Federal Health Care Programs ............................................. 17

   Introduction to Medicare .......................................................................... 17

Introduction to Medicaid Program .................................................................. 23

Introduction to TRICARE ............................................................................... 24

Introduction to the False Claims Act .............................................................. 26

Certifying Compliance with the Stark Laws and Anti-Kickback Statutes Is
Condition of Payment Under Federal Healthcare  Programs and False
Certifications are Actionable under the False Claims Act................................ 28

Introduction to Excessive Physician Compensation Paid by Broward Health
Based in Part on the Value and Volume of Referrals ...................................... 32

Broward Health Has Paid its Employed Orthopedic Surgeons Based in
Part on the Value and Volume of Referrals..................................................... 33

Broward Health's Excessive Physician Compensation Based on the
Volume and Value of Referrals Spans Multiple Practice Areas ...................... 41

Throughout the Broward Health System, Broward Health has
Compensated Physicians Based In Part on the Value and Volume of
Inpatient and Outpatient Referrals By Such Physicians to Broward Health
Hospitals and Clinics ..................................................................................... 46

Broward General Medical Center .................................................................. 47

North Broward Medical Center...................................................................... 48

Imperial Point Medical Center....................................................................... 49

For One Fiscal Year, Physician Compensation Produced Net Operating
Losses of Approximately $17,479,732 across the Broward Health System ....... 51

The Excessive Physician Compensation Is Not Justified by Physician
Productivity.................................................................................................... 53

Count I---Federal False Claims Act 31 U.S.C. Section 3729(a) (1)...................... 56

Count II---False Claims Act 31 U.S.C. 3729(a) (2) Use of False Statements........ 57

Count III---Federal False Claims Act 31 U.S.C. § 3729(a) (3) .............................. 58

Count IV---False Claims Act 31 U.S.C. 3729 (a) (7) False Record to Avoid
an Obligation to Refund................................................................................. 59

Prayers for Relief ........................................................................................... 60

## **Introduction**

1.        Under Rule 15 of the Federal Rules of Civil Procedure and under the

federal False Claims Act, 31 U.S.C. § 3729 et seq. ("FCA"), Dr. Reilly states his First Amended Complaint filed under seal with the Court as follows.

2.      Defendants North Broward Hospital District d/b/a Broward Health and Broward General Medical Center (sometimes referred to collectively as "Broward Health" or "the Broward Health Defendants") have given physicians excessive compensation which is not commercially reasonable and which is based in part on the volume and value of inpatient and outpatient referrals by such physicians to Broward Health hospitals and clinics. In providing such financial incentives for referrals from employed physicians, Defendants have violated Federal Stark and Anti-kickback laws discussed below. Defendants have knowingly submitted thousands of false claims to Federal Health Care Programs which claims arose through tainted referrals from employed physicians receiving excessive compensation from Broward Health.

3.      Defendants' knowing submission of false claims for payment constitutes a violation of the federal False Claims Act. Defendants have caused the United States to sustain a loss of funds and damage to its interests.

4.      The False Claims Act was amended pursuant to Public Law 111-21,

3

the Fraud Enforcement and Recovery Act of 2009 (FERA), enacted May 20, 2009. "The amendments made by this section shall take effect on the date of enactment of the Act and shall apply to conduct on or after the date of enactment, except that (1) subparagraph (B) of section 3729 (a) (1), as added by subsection (a) (1) shall take effect as if enacted on June 7, 2008, and apply to all claims under the False Claims Act (31 U.S.C. § 3729) that are pending on or after date..." FERA, § 4(f). The conduct in this First Amended Complaint occurred both before and after the enactment of FERA. Based upon information and belief, the illegal conduct identified in this First Amended Complaint at Broward Health is ongoing and continues through the present. This First Amended Complaint will predominantly reference pre-FERA numbering for paragraphs 3729(a) of the FCA with the limited exception of referencing the post-FERA numbering, pursuant to § 4(f) for conduct on or after June 7, 2008 when Defendants "knowingly make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim..." 31 U.S.C. § 3729 (a) (1) (B).

5.      Based on the False Claims Act, on behalf of the United States, Dr. Reilly seeks to recover all available damages, civil penalties, and other relief arising from the Broward Health Defendants' conduct described in this First Amended Complaint.

6.      All of the Defendants who engaged in the violations of federal laws at issue are not presently known by Dr. Reilly, and the precise amount of the loss to the federal government cannot presently be determined by Dr. Reilly.

## Parties

7.      Relator Michael Reilly, M.D., is a resident of Fort Lauderdale, Florida. He is an orthopedic surgeon who has held staff privileges to practice medicine at Imperial Point Medical Center, a hospital within the Broward Health system since 1989.  He formerly held staff privileges at two other Broward Health hospitals, Broward General Medical Center and North Broward Medical Center.  Through his work, medical practice, research, and investigation into physician compensation paid by Broward Health, he has gained direct, personal and independent knowledge that Defendants have violated federal Stark and Anti-Kickback Laws in compensating physicians based on the volume and value of inpatient and outpatient referrals.

8.      Defendant North Broward Hospital District d/b/a Broward Health comprises a "nonprofit" health care system which encompasses more than 30 healthcare facilities including Broward General Medical Center, North Broward Medical Center, Imperial Point Medical Center, Coral Springs Medical Center, and Broward Health Weston.

9.      Defendant Broward General Medical Center is the largest of the Broward Health hospitals and the primary place of practice for physicians receiving excessive salaries described in this First Amended Complaint.

10.     The headquarters of Broward Health are located at 303 SE 17th Street Fort Lauderdale, FL 33316.

11.     The identities of the remaining Doe defendants who knowingly submitted or caused the submission of false claims to the United States are presently unknown to Dr. Reilly.  All listed Defendants and such additional Doe defendants have served as contractors, agents, partners, and/or representatives of one and another in the submission of false claims to the United States and were acting within the course, scope and authority of such contract, conspiracy, agency, partnership and/or representation for the conduct described herein.

## Jurisdiction and Venue

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought under 31 U.S.C. §§ 3729 and 3730.

13.     Personal jurisdiction and venue are proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a), as Defendants

can be found, reside, transact business, or otherwise engaged in the illegal conduct at issue within the District.

14.     This action arises under the provisions of Title 31 U.S.C. § 3729, *et seq*, popularly known as the False Claims Act which provides that the United States District Courts shall have exclusive jurisdiction of actions brought under that Act.

15.     Section 3732(a) of the Federal False Claims Act provides, "Any action under section 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred."

16.     Relator has filed this action within the 6 year statute of limitations under the False Claims Act. As discussed below, this action seeks recovery under the False Claims Act for violations of federal Stark and Anti-Kickback Law with respect to claims for payment by federal health care programs arising from Fiscal Years 2004, 2005, 2006, 2007, 2008, 2009, and 2010. Broward Health's fiscal year ends on June 30. Within five months after the end of each fiscal year, Broward Health filed its cost reports which contained false certifications discussed below. Subsequent to the submission of such costs reports, federal health care programs paid claims in reliance

7

upon the false certifications for a particular fiscal year.

17.      Under the False Claims Act, the claims for violations of Stark and Anti-Kickback Laws did not accrue until the federal government made final payments for outpatient and inpatient admissions tainted by such violations in reliance upon Broward Health's false certifications of compliance in their cost reports discussed below.

18.      This First Amended Complaint is not based in any way upon the public disclosure of any allegations of fraud or transactions in any criminal, civil, or administrative hearing or any congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media.

19.      Dr. Reilly has complied with 31 U.S.C. §3730(b) (2) by serving a copy of the Complaint, First Amended Complaint, and written disclosures of substantially all the material evidence and information in his possession upon the United States Attorney for the Southern District of Florida and the United States Attorney General. Dr. Reilly also provided notice to the federal government prior to filing the Complaint and First Amended Complaint under seal with the Court.

### Introduction to Federal Stark Laws

20.      Section 1877 of the Social Security Act ("the Stark Law") generally

prohibits physician referrals of Medicare and Medicaid patients to health service providers with which the physician has an existing financial relationship. 42 U.S.C. § 1395nn (2000).

21.     Under the Stark Law, a physician has a "financial relationship" with an entity if the physician has an "ownership or investment interest in the entity" or "a compensation arrangement" with it. 42 U.S.C. § 1395nn (a) (2). Under the Stark Law, a "compensation arrangement" is "any arrangement involving any remuneration between a physician…and an entity." 42 U.S.C. § 1395nn (h) (1) (A).

22.     Under the Stark regulations, "compensation arrangement" is "any arrangement involving remuneration, direct or indirect, between a physician… and an entity." 42 C.F.R. § 411.354(c). "Remuneration" is defined as "any remuneration, directly or indirectly, overtly or covertly, in cash or in kind." 42 U.S.C. § 1395nn (h) (1) (B).

23.     The Stark Law provides that if a physician has a financial relationship with the entity, then:

> (A) the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and (B) the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under sub paragraph (A).

42 U.S.C. § 1395nn (a) (1).

24.     In addition to prohibiting the hospital from submitting claims under

these circumstances, the Stark Law also prohibits payment by the Medicare

program of such claims: "No payment may be made under this subchapter

for a designated health service which is provided in violation of subsection

(a)(1) of this section." 42 U.S.C. §1395nn (g) (1). If a hospital submits

prohibited claims and collects payment, the regulations implementing 42

U.S.C. § 1395nn require that any entity collecting payment for a healthcare

service "performed under a prohibited referral must refund all collected

amounts on a timely basis." 42 C.F.R. § 411.353.

### The Stark Statute's Broad Definition of "Referral"

25.     The Stark Statute defines "referral" as "the request or establishment of

a plan of care by a physician which includes the provision of designated

health services." 42 U.S.C. § 1395nn (h) (5) (A).

26.     The accompanying regulations interpreting the statute also broadly

define "referral" as, among other things, "a request by a physician that

includes the provision of any designated health service for which payment

may be made under Medicare, the establishment of a plan of care by a

physician that includes the provision of such a designated health service, or

10

the certifying or recertifying of the need for such a designated health service . . . ." 42 C.F.R § 411.351. A referring physician is defined in the same regulation as "a physician who makes a referral as defined in this section or who directs another person or entity to make a referral or who controls referrals made to another person or entity." *Id.*

27.     As discussed above, the Stark Statute broadly defines prohibited "financial relationships" to include any "compensation" paid directly or indirectly to a referring physician. The Stark Statute's exceptions then identify specific transactions that will not trigger its referral and billing prohibitions. To avoid the referral and billing prohibitions in the Stark Statute, a hospital's financial relationship with a physician must fall into one of the exceptions.

28.     Once the plaintiff or the government has established proof of each element of a violation under the Act, the burden shifts to the defendant to establish that the conduct was protected by an exception.

29.     One statutory exception to the Stark Law prohibition permits referrals if the physician and provider have a "bona fide employment relationship" in which the physician is being compensated at the "fair market value" in a manner that does not take into account "the volume or value of any referrals." 42 U.S.C.S. §§ 1395nn (e) (2), (3).  Federal law prohibits

physician salaries which "take [] into account (directly or indirectly) the volume or value of any referrals by the referring physician." *Id.* Additionally, the remuneration must be "commercially reasonable even if no referrals were made to the employer." 42 U.S.C.S. §§ 1395nn (e) (2), (3).

30.     Under the Stark Regulations' definition of "fair market value," the fair market price of compensation for service exists "where the price or compensation has not been determined *in any manner* that takes into account the volume or value of *anticipated or actual referrals*." 42 C.F.R. § 411.352 (emphasis added).  "Usually, the fair market price is the price at which...the compensation that has been included in bona fide service agreements with comparable terms at the time of the agreement, where the price or compensation has not been determined *in any manner that takes into account the volume or value of anticipated or actual referrals*." 42 C.F.R. § 411.351 (emphasis added).

31.     As stated by the Centers for Medicare and Medicaid Services (CMS), the Stark Act "establishes a straightforward test that compensation arrangements should be at fair market value for the work or service performed....not inflated to compensate for the physician's ability to generate other revenues." 66 Fed. Reg. at 877.

32.     A negotiated agreement between interested parties does not by

12

definition reflect fair market value. The Stark Act is predicated on the recognition that, when one party is in a position to generate business for the other, negotiated agreements between such parties are often designed to disguise the payment of compensation in excess of fair market value.

33.     The Stark Act provides that "[t]he term 'fair market value' means the value in arms length transactions, consistent with the general market value . . ." 42 U.S.C. § 1395nn(h)(3). The regulations amplify this definition as follows:

> Fair market value means the value in arm's-length transactions, consistent with the general market value. "General market value" means the price that an asset would bring as the result of bona fide bargaining between well-informed buyers and sellers *who are not otherwise in a position to generate business for the other party*, or the compensation that would be included in a service agreement as the result of bona fide bargaining between well-informed parties to the agreement *who are not otherwise in a position to generate business for the other party*, on the date of acquisition of the asset or at the time of the service agreement." 42 C.F.R. § 411.351 (emphasis added).

34.     In the Stark Phase II regulations, the definition of "fair market value" included a safe harbor that deemed arrangements to be fair market value if

13

they provided for hourly payments that were in line with the 50th percentile for the same specialty in at least four of six identified salary surveys. *See* former 42 C.F.R. § 411.351; 69 Fed. Reg. 16054, 16092. This safe harbor was subsequently eliminated in the 2007 Phase III regulations; however, CMS indicated that it still considers salary surveys as a factor in considering fair market value. *See* 72 Fed. Reg. 51012, 51015 ("Reference to multiple, objective, independently published salary surveys remains a prudent practice for evaluating fair market value.").

### The Anti-Kickback Statute Also Mandates that A Hospital's Compensation to an Employed Physician May Not Take Into Account the Volume or Value of Referrals to the Hospital

35.     The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), prohibits any person or entity from offering, making or accepting payment to induce or reward any person for referring, recommending or arranging for federally funded medical services, including services provided under the Medicare, Medicaid, and TRICARE programs.

36.   The Anti-Kickback Statute was enacted in 1972 to protect federal health care programs and their patients from fraud and abuse.  The law provides that anyone who knowingly and willfully receives or pays anything of value to influence a referral under a Federal health care program shall be guilty of a felony and upon conviction, shall be fined not more than $25,000 or

imprisoned for not more than five years, or both.  Specifically, it is a felony to knowingly and willfully

> offer[] or pay[] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person--(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program.

37.     The United States Department of Health and Human Services ("HHS") has promulgated regulations specifying those payment practices that will not be subject to criminal prosecution or provide a basis for administrative exclusion. The "Safe Harbor" regulations, 42 C.F.R. § 1001.952, list various circumstances under which a financial relationship between a provider and a referral source would not give rise to liability under the Anti-Kickback Statute. Payments to a physician under a personal service agreement must be "set in advance, [must be]… consistent with fair market value in arms-length transactions and [must]…not [be] determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part under Medicare or a State health care program." 42

C.F.R. § 1001.952(d) (2000).\

38.     The Anti-Kickback Statute arose out of Congressional concern that payoffs to those who can influence health care decisions would result in goods and services being provided that are medically unnecessary, too costly, or poor quality, or even harmful to a vulnerable patient population. The Anti-Kickback Statute was at least partially based on studies demonstrating that physicians, even those intending to act in good faith, were likely to refer significantly more patients when there exists a financial incentive to generate business. To protect the integrity of federal health care programs, and realizing the difficulty for regulators and law enforcement to review every case for medically unnecessary procedures, Congress enacted a *per se* prohibition against the payment of kickbacks in any form, regardless of whether the kickback gave rise to overutilization or poor quality of care.

39.     First enacted in 1972, Congress strengthened the statute in 1977 and 1978 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. *See* Social Security Amendments of 1972, Pub. L. No. 92-603, 242(b) and 9c); 42 U.S.C. § 1320a-7b, Medicare Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

40.     The finder of fact may infer that payments were intended to be

16

kickbacks based on testimony that the recipient of the payments was grossly overpaid for any legitimate professional services he may have rendered.

41.     Once the United States has demonstrated proof of each element of a violation of the Anti-Kickback and/or Stark Statutes, the burden shifts to the defendant to establish that his conduct was protected by a safe harbor or exception; the United States need not prove, as an element of its case, that defendant's conduct does not fit within a safe harbor or exception.

42.     Violation of the Anti-Kickback Statute may subject the perpetrator to exclusion from participation in federal health care programs, civil monetary penalties of $50,000 per violation, and three times the amount of remuneration paid, regardless of whether any part of the remuneration is for a legitimate purpose. 42 U.S.C. § 1320-7(b) (7) and 42 U.S.C. § 1320a-7a (a) (7).

**Introduction to Federal Health Care Programs**
**Introduction to Medicare**

43.     In 1965, Congress enacted Title XVIII of the Social Security Act (Medicare) to pay for the cost of certain medical services for persons aged 65 years or older and those with disabilities.

44.     Medicare is divided into four parts. Medicare Part A authorizes payment for institutional care, including hospital, skilled, nursing facility,

and home health care. *See* 42 U.S.C. §§ 1395c-1395i-4. Part B of the Medicare Program authorizes payment for outpatient health care expenses, including physician fees. *See* 42 U.S.C. §§ 1395-1395w-4. Defendants derived revenue from the Medicare program.

45. HHS is responsible for the administration and supervision of the Medicare Program. CMS is an agency of HHS and is directly responsible for the administration of the Medicare program.

46. Under the Medicare program, CMS makes payments retrospectively to hospitals for inpatient services. Medicare enters into provider agreements with hospitals to establish the hospitals' eligibility to participate in the Medicare Program. Medicare does not prospectively contract with hospitals to provide particular services for particular patients. Any benefits derived from those services are derived solely by the patients and not by Medicare or the United States.

47. To assist in the administration of Medicare Part A, CMS contracts with "fiscal intermediaries." 42 U.S.C. § 1395h. Fiscal intermediaries, typically insurance companies, are responsible for processing and paying claims and auditing cost reports.

48. Hospitals submit claims for interim reimbursement for items and services delivered to Medicare beneficiaries during their hospital stays. 42

C.F.R. §§ 413.1, 413.60, 413.64. Hospitals submit patient-specific claims for interim payments on a Form UB-92.

49.    As a condition of payment by Medicare, CMS requires hospitals to submit annually a Form CMS-2552, more commonly known as the hospital cost report. A cost report is the final claim that a provider submits to the fiscal intermediary for items and services rendered to Medicare beneficiaries. As discussed above and below, each cost report contains mandatory certifications of compliance with Stark and Anti-Kickback Laws.

50.    After the end of each hospital's fiscal year, the hospital files its cost report with the fiscal intermediary, stating the amount of reimbursement the provider believes it is due for the year. *See* 42 U.S.C. § 13959g); 42 C.F.R. § 413.20. Medicare relies upon the cost report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare. 42 C.F.R. §§ 405.1803, 413.60 and 413.64(f) (1).

51.    The Defendants were at all relevant times required to submit cost reports to their fiscal intermediary for each fiscal year.

52.    Medicare payments for inpatient hospital services are determined by the claims submitted by the provider for particular patient discharges (specifically listed on UB-92s) during the course of the fiscal year. On the

19

cost report, this Medicare liability for services is then totaled with any other Medicare liabilities to the provider. This total determines Medicare's true liability for services rendered to Medicare beneficiaries during the course of a fiscal year. From this sum, the payments made to the provider are subtracted to determine the amount due Medicare or the amount due the provider.

53.     At all times relevant to this First Amended Complaint, Medicare, through its fiscal intermediaries, had the right to audit the cost reports and financial representations made by Broward Health to ensure their accuracy and protect the integrity of the Medicare Program. This includes the right to adjust cost reports previously submitted by a provider if any overpayments have been made. 42 C.F.R. § 413.64(f).

54.     Each hospital cost report contains a "Certification" that must be signed by the chief administrator of the hospital provider or a responsible designee of the administrator.

55.     At all times relevant to this First Amended Complaint, each cost report certification page included the following notice: "Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil, and administrative action, fine and/or imprisonment under federal law. **Furthermore, if services provided in this**

report were provided or procured through the payment directly or indirectly of a kickback or where otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result." (Emphasis added).

56.     At all times relevant to this First Amended Complaint, on each cost report for each fiscal year,  the responsible officer of Broward Health was required to certify, in pertinent part, as follows: "I hereby certify that I have read the above statement [paragraph above] and that I have examined the accompanying electronically filed or manually submitted cost report….and that to the best of my knowledge and belief, it [the cost report] is a true, correct, and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. **I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.**" (Emphasis added).

57.     Broward Health was required to certify that their filed cost reports were  (1) truthful, i.e., that the cost information contained in the report is true  and  accurate, (2)  correct, i.e.,  that  the  provider  is  entitled  to reimbursement  for  the  reported  costs  in  accordance  with  applicable

instructions, (3) complete, i.e., that the cost report is based upon all knowledge known to the provider, (4) **that the services provided in the cost report were not linked to kickbacks, and (5) that the provider complied with laws and regulations regarding the provision of health care services, such as the Stark and Anti-Kickback Statutes.**

58.     Broward Health was also required to disclose all known errors and omissions in its claims for Medicare reimbursement (including its cost reports) to its fiscal intermediary. 42 U.S.C. § 1320a-7b (a) (3) specifically confirms the duty to disclose known errors in cost reports. "Whoever....having knowledge of the occurrence of any event affecting (A) his initial or continued right to any such benefit or payment...conceals or fails to disclose such event with an intent fraudulently to secure such benefit or payment either in a greater amount or quantity than is due or when no such benefit or payment is authorized...shall in the case of such a ....concealment or failure...be guilty of a felony."

59.     In the months following the end of each fiscal year, Broward Health submitted annual cost reports to the Centers for Medicare and Medicaid Services (CMS) and attested to the certifications stated above. Broward Health has submitted cost reports with the certifications stated above for fiscal years 2004, 2005, 2006, 2007, 2008, and 2009.

60.     In addition to the in-patient fees billed by hospitals, physicians also separately bill for their services provided to Medicare patients under Part B. Physicians and physician groups submit Form CMS-1500 for this purpose.

61.     Form CMS-1500 requires the physician to certify that he "understand(s) that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws."

62.     By submitting CMS-1500 forms, physicians and physician groups certify that they are eligible for participation in the Medicare Program, and that they have complied with all applicable regulations and laws governing the program, such as the Stark and Anti-Kickback Laws.

**Introduction to Medicaid Program**

63.     The Medicaid program is a cooperative Federal-State program established in 1965 for the purpose of providing Federal financial participation (FFP) to States that choose to reimburse certain costs of medical treatment for persons with limited income or resources. Medicaid is authorized under Title XIX of the Social Security Act, and is administered by each State in compliance with Federal requirements specified in the Medicaid statute and regulations.

64.     Each state's Medicaid program must cover hospital and physician services. 42 U.S.C. § 1396a (10) (A), 42 U.S.C. § 1396d (a) (1)-(2), (5). Florida's Medicaid Program uses Medicare cost reports in connection with Medicaid reimbursement. Defendants derived substantial revenue from the Medicaid Program.

65.     Defendants submitted claims to Medicaid that were based in part on their Medicare cost reports and their certifications of compliance with federal Stark and Anti-Kickback Laws. The Medicaid Program relied upon such certifications as mandatory conditions of payment before paying such claims submitted by Broward Health. Whenever the Medicare cost reports of Defendants contained false information or certifications, the claims of Defendants to Medicaid were also false.

### Introduction to TRICARE

66.     TRICARE is a federally-funded program that provides medical benefits, including hospital services, to certain relatives of active duty, deceased, and retired service members or reservists, as well as to retirees. TRICARE sometimes provides for hospital services at non-military facilities for active duty service members as well. 10 U.S.C. §§ 1071-1110; 32 C.F.R. § 199.4(a).  Defendants derived revenue from the TRICARE Program.

67.     In addition to individual patient costs, TRICARE reimburses hospitals

for two types of costs, both based on the Medicare cost report: capital costs and direct medical education costs. 32 C.F.R. § 199.6.

68.     A provider seeking reimbursement from TRICARE for these costs is required to submit a TRICARE form, "Request for Reimbursement of CHAMPUS Capital and Direct Medical Education Costs" ("Request for Reimbursement"), in which the provider sets forth the number of patient days and financial information related to these costs. These costs are derived from the provider's Medicare cost report.

69.     The Request for Reimbursement requires that the provider certify that the information contained therein is "is accurate and based upon the hospital's Medicare cost report."

70.     Upon receipt of a provider's Request for Reimbursement, TRICARE or its fiscal intermediary applies a formula for reimbursement wherein the provider receives a percentage of its capital and medical education costs equal to the percentage of TRICARE patients in the hospital.

71.     Defendants submitted Requests for Reimbursement to TRICARE that were based on their Medicare cost reports. Whenever the Medicare cost reports of Defendants contained false information or false certifications from which they derived their Requests for Reimbursement submitted to TRICARE, those Requests for Reimbursement were also false.

72.     Whenever their Requests for Reimbursement were false due to falsity in their Medicare cost reports, Defendants falsely certified that the information contained in their Requests for Reimbursement was "accurate and based upon the hospital's Medicare cost report."

## Introduction to the False Claims Act

73. The False Claims Act ("FCA") provides in pertinent part:

> i. Any person who (1) knowingly presents or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Force of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; (3) conspires to defraud the Government by getting a false or fraudulent claim paid or approved by the Government; . . or (7) knowingly makes, uses, or caused to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, plus 3 times the amount of damages which the Government sustains because of the act of that person . . .(b) For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

31 U.S.C. § 3729.

74.     Under the pre-FERA and post-FERA Federal False Claims Act, "'knowing' and 'knowingly' mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required." 31 U.S.C. 3729 (b).

75.     In considering the requisite scienter which subjects a defendant to liability under the False Claims Act, "no proof of specific intent to defraud is required." *Id.* Under the False Claims Act, a defendant is liable for acting in "reckless disregard of the truth or falsity of the information" or acting in "deliberate ignorance of the truth or falsity of the information." *Id.*

76. The FCA establishes liability, *inter alia,* for anyone who "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1), or "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government," 31 U.S.C. § 3729(a)(2), or "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(7) (emphasis added).

77. Protection of the public treasury requires that those who seek public funds act with scrupulous regard for the requirements of law. Participants in federal health care programs have a duty to familiarize themselves with the legal requirements for payment and ensure compliance. A defendant who fails to inform himself of those requirements acts in reckless disregard or in deliberate ignorance of those requirements, either of which was sufficient to charge him with knowledge of the falsity of the claims in question. Likewise, a defendant who fails to verify and evaluate the accuracy of information or investigate the accuracy of information when on notice of questions concerning the accuracy of such information acts in reckless disregard or deliberate ignorance sufficient to charge him with knowledge of the falsity of the claims in question.

<u>**Certifying Compliance with the Stark Laws and Anti-Kickback Statutes Is Condition of Payment Under Federal Healthcare  Programs and False Certifications are Actionable under the False Claims Act**</u>

78.      Federal law establishes that falsely certifying compliance with the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b (b), and Stark Statute, 42 U.S.C. § 1395nn, in a Medicare cost report is actionable under the False Claims Act. False claims to Medicare, including Medicare cost reports and UB-92s (also known as form "HCFA-1450"), are actionable under the False

Claims Act. The submission of UB-92s in violation of the Stark Statute constitutes a violation of the False Claims Act.

79.    The Stark Laws state that compliance is a mandatory condition of Medicare payments. Likewise, compliance with the Anti-Kickback Statute is a mandatory condition of payment by the Medicaid Program. 42 U.S.C. § 1320a-7b (b).

80.    On their annual cost reports submitted to CMS for each of the fiscal years in question, Defendants have certified that none of the services billed federal health care programs were "provided or procured through the payment directly or indirectly of a kickback." Each cost report states, "**If services identified in this report were provided or procured through the payment directly or indirectly of a kickback or where otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.**" (Emphasis added).  The cost report certification was signed by an officer or administrator of Broward Health, who certified "**that I am familiar with the laws and regulations regarding the provision of health care services and that the services identified in this cost report were provided in compliance with such laws and regulations.**" (emphasis added). The certifications are a prerequisite to payment under federal health care programs. Broward Health's express certifications were and continue to

be knowingly false for the reasons stated in this First Amended Complaint.

81.      Defendants have also violated the federal False Claims Act through other certifications of compliance with the Anti-Kickback Laws and Stark Statute, which certifications are prerequisites to enrollment in federal health care program and Defendants' receipt of Medicare and Medicaid payments. The enrollment application that providers must execute to participate in the Medicare program, Form CMS-855A, contains the following certification: "I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. **I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including but not limited to, the Federal anti-kickback statute and the Stark law),** and on the provider's compliance with all applicable conditions of participation in Medicare." (Emphasis added).

82.      After violating the federal Stark and Anti-Kickback Laws, Defendants violated the federal False Claims Act through their knowingly false express and implied certifications which were conditions of payment from Federal health care programs, including Medicare, Medicaid, and

TRICARE.

83.     For the time period of claims arising from Fiscal Years 2004, 2005, 2006, 2007, 2008, 2009, and 2010 through the present, the Broward Health Defendants have submitted thousands of claims to federal health care programs which claims represent referrals from employed physicians receiving excessive compensation in violation of federal Stark and Anti-Kickback Laws.

84.     As discussed in detail below, Broward Health has regularly and systematically tracked and monitored the value, volume, and identity of all claims which represent referrals from employed physicians to Broward Health hospitals and clinics.

85.     The Defendants are in possession of the Forms UB-92, Medicare cost reports and corresponding Medicaid or TRICARE forms used to make claims for services arising from referrals from employed physicians receiving commercially unreasonable compensation from Broward Health.

86.     Additionally, Defendants' certification of compliance with federal Stark and Anti-Kickback Laws was an express condition of all payments made by any federal health care program, including Medicare, Medicaid, and TRICARE, to Broward Health. Thus, Defendants' false certification of compliance with federal Stark and Anti-Kickback laws in their cost reports

triggered every payment made by any federal health care program during the years in which Broward Health was paying excessive compensation to physicians based in part on the value and volume of inpatient and outpatient referrals by such physicians to Broward Health hospitals and clinics.

### Introduction to Excessive Physician Compensation Paid by Broward Health Based in Part on the Value and Volume of Referrals

87.     Broward Health's internal financial reports and analyses of physician revenues and expenses confirm the following primary five facts: (1) Broward Health has agreed to pay physician compensation based in part on anticipated profits from anticipated referrals from such physicians, (2) Broward Health has not simply compensated physicians based on the value of the physicians' services and revenue from such services, (3) Broward Health has known that its compensation of employed physicians have caused major net operating losses, (4) Broward Health has permitted such net operating losses from employed physicians by closely and systematically tracking profits from actual referrals by such employed physicians to Broward Health hospitals and clinics, and (5) Broward Health has compensated physicians in excess of fair market value if profits from referrals by such physicians are not considered.

88.    One of Broward Health's objectives in tracking profits from referrals by employed physicians is to determine whether ongoing referrals offset the excessive physician compensation and then apply pressure upon such physicians to generate more referrals.

89.    The excessive compensation given by the Broward Health Defendants to employed physicians has crossed multiple physician groups from Fiscal Year 2004 through the present.

### Broward Health Has Paid its Employed Orthopedic Surgeons Based in Part on the Value and Volume of Referrals

90.    In December of 2003, Broward Health hired three orthopedic surgeons who did not have a record of profitability while working as employees of Holy Cross Hospital and prior to that time, Health South.  Dr. Reilly was familiar with these physicians from his practice as an orthopedic surgeon in the region. Despite the relatively modest gross revenue produced by these physicians (approximately $413,632 to $437,799.75 before overhead and expenses) in 2003, Broward Health entered into a 9 year contract with these three physicians at excessive compensation levels.

91.    The North Broward Hospital District ("NBHD") Summary of Request dated April 23, 2003 addressed the NBHD proposed employment contract with Drs. Kanell, Caldwell, and Yoldas for a period of nine years. This

Summary of Request was prepared by employees of NBHD on its letterhead. Included within this Summary of Request prepared by NBHD is a five year "Proforma" for the Sports Medicine Program. This Proforma was prepared by employees of Broward Health. \

92.   The Proforma was used to obtain the approval of the NBHD Board of Commissioners to hire these three orthopedic surgeons under a 9 year employment contract.   Beginning in Fiscal Year 2004, Broward Health submitted claims to federal health care programs which arose out of tainted referrals from these three physicians.

93.   Broward Health's internal Proforma confirms that it hired and agreed to compensate these orthopedic surgeons based in part on the value of anticipated referrals from these physicians to Broward Health hospitals and clinics. As discussed below, the Proforma demonstrates that the aggregate compensation paid by Broward Health to these three orthopedic surgeons took into account the anticipated value of referrals generated by these physicians to Broward Health hospitals and clinics in clear violation of federal Stark Laws.

94.   Broward Health's compensation arrangement that took into account the value of anticipated referrals was significantly greater than what would be paid by parties who are not in a position to refer business to each other.

95. Detailed analyses of the financial projections in the Proforma evidence a plan to violate or disregard federal Stark laws with respect to the employment of Drs. Kanell, Caldwell, and Yoldas. In the original Proforma, NBHD listed the monetary projected value of "ancillary revenue" and "rehab revenue" after listing the physicians' practice revenue. For Year 1, NBHD listed the "ancillary revenue" associated with these 3 physicians as $788,837 and the "rehab revenue" associated with these 3 physicians as $500,000. For Year 2, NBHD listed the "ancillary revenue" associated with these 3 physicians as $804,614 and the "rehab revenue" associated with these 3 physicians as $510,000.

96. For Year 3, NBHD listed the "ancillary revenue" associated with these 3 physicians as $820,706 and the "rehab revenue" associated with these 3 physicians as $520,200. For Year 4, NBHD listed the "ancillary revenue" associated with these 3 physicians as $837,120 and the "rehab revenue" associated with these 3 physicians as $530,604. For Year 5, NBHD listed the "ancillary revenue" associated with these 3 physicians as $853,863 and the "rehab revenue" associated with these 3 physicians as $541,216.

97. If the value of "ancillary" and "rehab" revenues was not included in the Proforma and financial evaluation by Broward Health, then under the five year Proforma projections, in hiring these three physicians, Broward Health

would have net losses of $1,312,433 in Year 1, $1,292,926 in Year 2, $1,272,911 in Year 3, $1,252,360 in Year 4, and $1,231,244 in Year 5. These projected net losses do not include the "commitment of between $1.5 and $2.5 million in start-up capital" as stated by Broward Health on the Summary of Request.

98.   NBHD also prepared a revised Five Year Proforma dated November 10, 2003. Although the revised Proforma deleted the blatant calculation of "ancillary revenue," the revised Proforma still explicitly considered the monetary value of "Rehab Revenue" from referrals generated by the three orthopedic surgeons.[1]

99.   Under this revised Proforma, the net operating losses created by the employment of these 3 physicians increased to $1,099,235 under Broward Health's own calculations even after factoring in the value of rehabilitation referrals which were projected to total $2,501,520 over a five year period. Thus, according to NBHD's own projections in the revised Proforma, the net operating loss from these 3 physicians would be over 3.5 million dollars in the five year period.   These projected net losses also do not include the

---

[1] Under the Stark laws, the definition of "designated health services" includes "physical therapy" and "occupational therapy." 42 C.F.R. § 411.351(1) (ii).  Referral revenue from rehabilitation services was always a target of Broward Health in entering into the employment agreements and determining physician compensation.

"commitment of between $1.5 and $2.5 million in start-up capital" as stated by Broward Health on the Summary of Request.

100.  In the original Proforma, NBHD inflated projected practice revenues from these three physicians. In evaluating the projected practice revenues for these three physicians in the original Proforma, NBHD used the practice revenue numbers of $2,491,451 in Year 1, $2,541,280 in Year 2, $2,592,105 in Year 3, $2,643,948 in Year 4, and $2,696,824 in Year 5. Broward Health used inflated practice revenue numbers and even under those inflated revenue numbers, Broward Health would lose massive amounts of money each year by employing these physicians at such compensation levels without considering the value of referrals by these physicians to Broward Health hospitals and clinics.

101.  In the revised Proforma, NBHD lowered the Practice Revenue Projections to $1,810,370 in Year 1, $2,089,720 in Year 2, $2,243,700 in Year 3, $2,288,574 in Year 4 and $2,334,345 in year 5.  These numbers were still grossly inflated over the physicians' track record of revenues at Holy Cross Hospital.

102.  Broward Health knowingly entered into employment agreements with three physicians that would result in net operating losses of over 8 million dollars within 5 years according to the original Proforma prepared by

NBHD. Broward Health approved these employment terms based in part on the anticipated value of referral revenues from these 3 physicians. Under the revised Proforma prepared by NBHD, the net operating losses created by the employment of these 3 physicians would be over 5 million dollars according to NBHD's own projections.

103. The employment terms with the Orthopedic Sports Medicine Group, Drs. Kanell, Caldwell, and Yoldas, have resulted in major net operating losses to Broward Health if referral profits are not considered. For fiscal year July 2007-June 2008, the NBHD financial analysis confirms that the "Ortho Sports Medicine" group (which includes Dr. Yoldas and Dr. Caldwell) had net losses of $1,816,973 in that year and net losses of $1,511,742 in the prior year. According to internal financial reports, Broward Health's "planned budget" contemplated net annual losses of $1,645,093 from the "Ortho Sports Medicine" group. **Broward Health knew that its excessive compensation of the orthopedic surgeons caused significant net operating losses year after year without considering profits from referrals.**

104. Broward Health paid orthopedic surgeon Erol Yoldas at least $1,391,184.23 in 2008 and $1,557,984.40 in 2009, despite the fact that the 90th percentile (the highest percentile category) salary for orthopedic

surgery-sports medicine in the Southern U.S. was $1,209,569 in 2008.

105.   Broward Health has regularly performed extensive financial analyses of the expenses and profits generated by Dr. Yoldas, including the value and volume of inpatient and outpatient referrals generated by Dr. Yoldas to Broward Health hospitals and clinics. At the end of Fiscal Year 2009 (June), Broward Health performed such an analysis of Dr. Yoldas which showed that in evaluating the net revenue and expenses of his personal practice, Broward Health faced a net loss of $791,630.  Dr. Yoldas' "net operating revenue" as determined by Broward Health was $1,296,484 as of June in Fiscal Year 2009. However, "expenses" from his practice, including his compensation, totaled $2,088,114 as of June.

106.   As Broward Health tracked and monitored "inpatient contribution margins" and "outpatient contribution margins" from referrals by Dr. Yoldas to Broward Health hospitals and clinics, the total contribution margin was a profit of $867,326. Broward Health has paid Dr. Yoldas a salary which far exceeds the 90th percentile of physician compensation and which Broward Health has permitted by tracking and monitoring the inpatient and outpatient profits for Broward Health generated by referrals from Dr. Yoldas' practice.

107.   Broward Health paid orthopedic surgeon George Caldwell at least $1,373,304.73 in 2008 and $1,424,356.85 in 2009, despite the fact that the

90th percentile salary for orthopedic surgery-sports medicine in the Southern United States was $1,209,569 in 2008.

108.    Broward Health has regularly performed extensive financial analysis of the expenses and revenues generated by Dr. Caldwell, including the value and volume of inpatient and outpatient referrals from Dr. Caldwell to Broward Health hospitals and clinics. In June of 2009, Broward Health performed such an analysis of Dr. Caldwell which showed that in evaluating the net revenue and expenses of his personal practice, Broward Health faced a net loss of $814,007. Dr. Caldwell's "net operating revenue" as determined by Broward Health was $1,142,810 as of June at the end of Fiscal Year 2009. However, "expenses" from his practice, including his compensation, totaled $1,956,817.

109.    However, when Broward Health evaluated "inpatient contribution margins" and "outpatient contribution margins" from referrals by Dr. Caldwell to Broward Health hospitals, the total contribution margin was a profit of $38,521. Broward Health has paid Dr. Caldwell a salary which far exceeds the 90th percentile of physician compensation and which Broward Health has permitted by tracking and monitoring profits from inpatient and outpatient referrals from Dr. Caldwell's practice to Broward Health hospitals and clinics.

## Broward Health's Excessive Physician Compensation Based in Part on the Volume and Value of Referrals Spans Multiple Practice Areas

110.     Broward Health's excessive compensation to employed physicians has spanned multiple practice areas.

111.     Broward Health paid cardiologist Dr. Atanasoski a/k/a Dr. McCormack at least $1,003,208.40 in 2008 and $1,020,119.20 in 2009. The 90th percentile salary (the highest percentile category) for invasive cardiologists in the Southern United States was $800,040 in 2008 and the 90th percentile compensation for noninvasive cardiologists in the Southern U.S. was $850,744 in 2008.

112.     Similar to the employed orthopedic surgeons, Broward Health has regularly performed extensive financial analysis of the expenses and revenues generated by Dr. McCormack, including the value and volume of inpatient referrals and outpatient referrals by Dr. McCormack to Broward Health hospitals and clinics.

113.     In June of 2009 at the end of the fiscal year, Broward Health performed such an analysis of Dr. McCormack which showed that in evaluating the net revenue and expenses of her personal practice, Broward Health faced a net loss of $548,140 for fiscal year 2009. Dr. McCormack's "net operating revenue" as determined by Broward Health was $835,590 at

the end of fiscal year 2009. However, "expenses" from her practice, including her compensation, totaled $1,383,730.

114.     As Broward Health tracked and evaluated "inpatient contribution margins" and "outpatient contribution margins" produced by referrals from Dr McCormack's practice to Broward Health hospitals and clinics, the total contribution margin was a net profit of $2,053,285 instead of the net operating loss produced by her practice of $548,140. Broward Health has paid Dr. McCormack a salary which far exceeds the 90th percentile of physician compensation and which Broward Health has permitted by evaluating and monitoring the inpatient and outpatient profits to Broward Health generated by referrals from Dr. McCormack's practice.

115. In cardiology, the Broward Health Defendants paid cardiologist Dr. Michael Chizner at least $1,161,953.12 in 2008 and $1,158,360.76 in 2009, despite the fact that the 90th percentile salary for invasive cardiologists in the Southeast was $800,040 in 2008 and the 90th percentile for noninvasive cardiologists in the Southeast was $850,744 in 2008.[2]

116. In June of 2009 at the end of the fiscal year, the Broward Health

---

[2]   The percentiles quoted in this First Amended Complaint are compiled and published by the Medical Group Management Association which is the leading national survey of physician compensation widely recognized and used in the health care industry.

Defendants analyzed profits from employed physicians, including Dr. Chizner. In evaluating the net revenue and expenses of his personal practice, Broward Health faced a net loss of $750,495. Dr. Chizner's "net operating revenue" as determined by Broward Health was $576,948. However, "expenses" from his practice, including his salary, totaled $1,327,443. As Broward Health tracked and monitored "inpatient contribution margins" and "outpatient contribution margins" from referrals by Dr. Chizner to Broward Health hospitals and clinics, the total contribution margin was a profit of $78,781. Broward Health has paid Dr. Chizner a salary which far exceeds the 90th percentile of physician compensation and which Broward Health has permitted by tracking and monitoring inpatient and outpatient profits to Broward Health generated by referrals from Dr. Chizner's practice.

117.   The excessive compensation to Dr. Chizner cannot be justified by his personal RVU production.[3]  The RVUs reported by Dr. Chizner fall below the 25th percentile according to the 2009 MGMA Survey. The Broward

_____

[3]  RVU is an acronym that stands for "relative value unit." Some physician employers such as hospitals and groups use an RVU formula to calculate compensation or bonuses for physicians. An RVU is a dollar amount that is assigned to each encounter, procedure, or surgery. The value is standardized, but the way the value is used in the compensation formula may vary from employer to employer. The MGMA tracks RVU values for various physician specialties. These values are included in the annual physician compensation report published by the MGMA.

Health Operating Statement in September 2009 reports Dr. Chizner's RVUs over two months as 1,119. The "planned budget" RVUs for Dr. Chizner over this time period are 1,525 according to the Broward Health Operating Statement. At the rate of 1,119 RVUs every two months, Dr. Chizner would generate 6,714 RVUs in a fiscal year. That level of RVU production falls just over the 25th percentile for noninvasive cardiologists in the Southern United States according to the 2009 MGMA Survey. Yet Broward Health paid Dr. Chizner at least $1,161,953.12 in 2008 and $1,158,360.76 in 2009. The 90th percentile salary (the highest percentile category) for invasive cardiologists in the Southeast was $800,040 in 2008 and the 90th percentile for noninvasive cardiologists in the Southeast was $850,744 in 2008.[4]

118.   Broward Health paid cardiologist Dr. Ashok Sharma at least $1,084,178.40 in 2008 and $1,038,575.80 in 2009, despite the fact that the 90th percentile (the highest percentile category) compensation for noninvasive cardiologists in the Southern U.S. was $850,744 in 2008.

119.   Broward Health has regularly performed similar extensive financial analyses of the expenses and revenues generated by Dr. Sharma, including the value and volume of inpatient referrals and outpatient referrals from Dr.

---

[4]   The cited percentiles are compiled and published by the Medical Group Management Association which conducts the leading national surveys of physician compensation widely recognized in the health care industry.

Sharma to Broward Health hospitals and clinics. At the end of the fiscal year in June of 2009, Broward Health performed such an analysis of Dr. Sharma which showed that in evaluating the net revenue and expenses of his personal practice, Broward Health faced a net loss of $701,222. Dr. Sharma's "net operating revenue" as determined by Broward Health was $1,459,419. However, "expenses" from his practice, including his compensation, totaled $2,160,641 as of June. As Broward Health tracked and evaluated "inpatient contribution margins" and "outpatient contribution margins" from referrals by Dr. Sharma to Broward Health hospitals and clinics, the total contribution margin was a net loss of $320,518 instead of $701,222. Broward Health has paid Dr. Sharma a salary which far exceeds the 90th percentile of physician compensation and which Broward Health has permitted by tracking and monitoring profits to Broward Health generated by referrals from Dr. Sharma's practice.

120.    In that fiscal year, Dr. Sharma's referrals to Broward Health were not sufficient to offset his excessive compensation. When such referral profits fall short in offsetting excessive physician compensation, Broward Health regularly applies pressure upon its employed physicians to generate more referrals to Broward Health hospitals and clinics. That strategy of pressure is one of the reasons that Broward Health systematically tracks referral

profits from employed physicians.

## Throughout the Broward Health System, Broward Health has Compensated Physicians Based In Part on the Value and Volume of Inpatient and Outpatient Referrals By Such Physicians to Broward Health Hospitals and Clinics

121.    Broward Health's internal financial reports confirm that it has engaged in extensive and systematic analyses and monitoring of the value and volume of inpatient and outpatient referrals from employed physicians to hospitals and clinics within the Broward Health system.

122.    Broward Health's internal financial reports also reveal that the compensation paid to employed physicians exceeds the value of the physicians' personal productivity and net revenues from services performed by such physicians. Broward Health has paid excessive compensation to its employed physicians under a business model which tracks profits from referrals by those physicians to Broward Health hospitals and clinics.

123.    Throughout the years relevant to this First Amended Complaint, Broward Health has regularly produced a "Physician Practice Contribution Margin" Report during each fiscal year and at the end of each fiscal year. In the "Physician Practice Contribution Margin" Reports, Broward Health has systematically and methodically tracked the volume and value of inpatient and outpatient referrals from employed physicians to Broward Health

hospitals and clinics.

124.    At each of its hospitals, Broward Health has systematically tracked the volume and value of inpatient and outpatient referrals from its employed physicians. Broward Health's internal reports confirm that at every hospital within the Broward Health system, the physician practice groups are being paid at levels which produce significant net operating losses.

125.    Broward Health's internal reports confirm that physician compensation commonly significantly exceeds the value of their personal production or the value of net revenues from services performed by such physicians **if profits from referrals are not considered.**

### Broward General Medical Center

126.    As of June at the end of the 2009 Fiscal Year, at Broward General Medical Center, the employed physician practice groups had produced operating revenue of approximately $13,249,062, yet "expenses" from their practices (which primarily represent physician compensation) equaled approximately $23,688,887. The physician compensation produced a "net loss from operations" in the amount of approximately $10,439,825 at Broward General according to Broward Health's own reports.

127.    Despite this major operating loss from the physician practice groups at Broward General Medical Center, Broward Health tracked the "Contribution

Compensated Care" from the physician practice groups which consisted of four variables: (1) the "inpatient contribution margin," (2) "outpatient contribution margin," (3) "cases inpatient," and (4) "cases outpatient." These variables represent the value and volume of referrals from employed physicians to the hospital. The value numbers represent profits to Broward Health.

128.    Broward Health calculated the "Inpatient Contribution Margin" for employed physician practice groups at Broward General was $8,530,535 for Fiscal Year 2009 and the "Outpatient Contribution Margin" for employed physician practice groups at Broward General was $12,571,211. Broward Health tracked the "cases inpatient" from employed physician practice groups at Broward General as 2,186 and the "Cases Outpatient" as 13,266.

129.    The profits from referrals by employed physicians at Broward General turned the net operating loss of $10,439,825 into a profit of $10,661,921. The profits from physician referrals represented an approximate 20 million dollar swing from net loss to net profit at Broward General as confirmed by Broward Health's internal reports.

**North Broward Medical Center**

130.    As of June at the end of the 2009 Fiscal Year, at North Broward Medical Center, the employed physicians had produced operating revenue of

48

$1,141,019, yet "expenses" from their practices (which primarily represent physician compensation) equaled $2,634,114. The physician compensation produced a "net loss from operations" in the amount of $1,493,095 at North Broward Medical Center.

131.     Despite this operating loss from the physician practice groups at North Broward Medical Center, Broward Health again tracked the "Contribution Compensated Care" which consisted of four variables: (1) the "inpatient contribution margin," (2) "outpatient contribution margin," (3) "cases inpatient," and (4) "cases outpatient." These variables represent the value and volume of referrals by employed physicians to North Broward Medical Center.

132.     Broward Health calculated the "Inpatient Contribution Margin" for employed physician practice groups at North Broward Medical Center was $1,200,134 for Fiscal Year 2009 and the "Outpatient Contribution Margin" for employed physician practice groups at North Broward Medical Center was $121,823. Broward Health tracked the "cases inpatient" from employed physician practice groups at North Broward Medical Center as 371 and the "Cases Outpatient" as 597.

**Imperial Point Medical Center**

133.    As of June at the end of the 2009 Fiscal Year, at Imperial Point
Medical Center, the employed physicians had produced operating revenue of
$2,539,591, yet "expenses" from their practices (which primarily represent
physician compensation) equaled $5,089,832. According to Broward
Health's internal reports, the physician compensation produced a "net loss
from operations" in the amount of $2,550,241 at Imperial Point Medical
Center.

134.    Despite this operating loss, Broward Health again tracked the
"Contribution Compensated Care" from the physician practice groups which
consisted of four variables: (1) the "inpatient contribution margin," (2)
"outpatient contribution margin," (3) "cases inpatient," and (4) "cases
outpatient." These variables represent the value and volume of referrals by
employed physicians to Imperial Point Medical Center.

135.    Broward Health calculated the "Inpatient Contribution Margin" for
employed physician practice groups at Imperial Point Medical Center was
$1,624,836 for Fiscal Year 2009 and the "Outpatient Contribution Margin"
for employed physician practice groups at Imperial Point Medical Center
was $2,818,230. Broward Health tracked the "cases inpatient" from
employed physician practice groups at Imperial Point Medical Center as 576
and the "Cases Outpatient" as 8,526.

136.     By tracking the value of profits from referrals by employed physicians to Imperial Point Medical Center, the net operating loss of 2.5 million dollars caused by physician compensation became a 1.8 million dollar profit to Broward Health in that fiscal year.

### For One Fiscal Year, Physician Compensation Produced Net Operating Losses of Approximately $17,479,732 across the Broward Health System

137.     Broward Health's regular business practice has been to closely track the volume and value of referrals from employed physicians to Broward Health hospitals and to compensate employed physicians based in part on the value and volume of referrals from such employed physicians to Broward Health hospitals and clinics.

138.     Broward Health's internal reports confirm that it has compensated employed physicians at levels which produce major net operating losses if the profits from referrals by those physicians are not considered.

139.     As of June at the end of Fiscal Year 2009, across the Broward Health system, the year-to-date net loss from employed physician practice groups was approximately $17,479,732 according to Broward Health's internal reports. Excessive physician compensation was the primary factor which caused this significant net operating loss.

140.     Based on information and belief, excessive physician compensation

has caused significant net operating losses at Broward Health for each of the prior Fiscal Years 2004, 2005, 2006, 2007, and 2008.

141.     Broward Health has been fully aware of such operating losses each year while it regularly tracked and evaluated the inpatient and outpatient "contribution margins" from such physicians which transformed the net loss of approximately $17,479,732 into a profit of approximately $11,433,330 with respect to the Fiscal Year ending in June of 2009. The "contribution margins" actually represent the profits from referrals by employed physicians to Broward Health hospitals and clinics as confirmed on internal reports prepared by Broward Health.

142.     In a scheme which violates Federal Stark and Anti-kickback Laws, Broward Health has agreed to pay its employed physicians at excessive levels in anticipation of referral profits. Broward Health has executed such scheme by closely monitoring profits from actual inpatient and outpatient referrals from such employed physicians to Broward Health hospitals and clinics.

143.     Based on information and belief, Dr. Reilly believes that the illegal conduct and violations of Federal Stark and Anti-Kickback Laws identified in this First Amended Complaint have continued into 2010 and are ongoing at Broward Health.

## The Excessive Physician Compensation Is Not Justified by Physician Productivity

144.     With employed physicians producing major net operating losses if the value and volume of referrals are not considered, such physicians' compensation cannot be justified legitimately by the personal production or personal services of such physicians or RVUs.[5] The relatively modest net operating revenues produced by employed physicians' services do not reflect high personal productivity or high RVUs.

145.     There are numerous employed physicians at Broward Health who are not being compensated at levels which only contemplate their personal production or RVUs. Instead, the physicians are being evaluated and compensated under a scheme which closely tracks the volume and value of the employed physicians' anticipated and actual referrals to Broward Health hospitals and clinics.

146.     There is also evidence that some physicians' RVUs have been inflated beyond plausible levels and Broward Health has been complicit in

---

[5] RVU is an acronym that stands for "relative value unit." Some physician employers such as hospitals and groups use an RVU formula to calculate compensation or bonuses for physicians. An RVU is a dollar amount that is assigned to each encounter, procedure, or surgery. The value is standardized, but the way the value is used in the compensation formula may vary from employer to employer. The MGMA tracks RVU values for various physician specialties. These values are included in the annual physician compensation report published by the MGMA.

such schemes while staying focused on the value and volume of ancillary referrals produced by its employed physicians.

147.     For example, the RVU numbers listed for Dr. Yoldas are implausible. On the September 2009 Broward Health Operating Statement, for the two month period of August and September, Dr. Yoldas' RVUs are listed as 3,988. Broward Health listed "budgeted RVUs" for the same time period to be 3,827. These numbers reflect physician work production at approximately 50 percent over the 90th percentile range according to the MGMA Survey for 2009.

148.     Such enormous levels of RVU production are also inconsistent with the revenue collections of Dr. Yoldas' practice which totaled $1,296,494 for fiscal year 2009. Such revenue collections are less than the 75th percentile for sports medicine orthopedic surgeons in the Southern United States according to the 2009 MGMA Survey. So while Dr. Yoldas' purported RVUs are approximately 50 percent more than the 90th percentile, his collections for professional charges are below the 75th percentile.

149.     More probably than not, the RVU numbers for Dr. Yoldas are inaccurately inflated. There are numerous ways to inflate RVU numbers. As an orthopedic surgeon, Dr. Yoldas performed numerous types of surgical procedures. The RVU codes for surgical procedures commonly include

multiple related procedures in a single RVU.  If those RVU codes are "unbundled" which means each related procedure is listed as a separate RVU, the numbers of RVUs can be inflated.

150.    The RVU numbers listed for Dr. Yoldas are so high under the circumstances here that Broward Health had to have known that such numbers were implausible and inflated.  Yet Broward Health has tracked and profited from Dr. Yoldas' referrals to Broward Health hospitals and clinics. Such referral profits totaled $1,668,739 for the Fiscal Year ending June of 2009 according to Broward Health's systematic evaluation and calculations.

151.    The RVU numbers for other physicians also appear inflated at implausible levels. For example, the Broward Health Operating Statement dated September 10, 2009 indicates that Dr. Violet Atanasoski aka Dr. Violet McCormack produced 3,672 RVUs for the two month period of July-August 2009. Her "planned budget" RVUs are even higher at 4,027. Such numbers are implausible for an invasive cardiologist like Dr. Atanasoski. The 2009 MGMA Survey indicates that the highest percentile (90th percentile) of invasive cardiologists in the Southern United States produce 13,458 RVUs per year. Dr. Atanasoski's RVUs for two months are on pace to produce 22,032 RVUs in a year. Broward Health's "planned budget"

RVUs for Dr. Atanasoski are even higher at 24,162 for the Fiscal Year ending in June of 2010. These numbers are implausible.

## Count I---Federal False Claims Act 31 U.S.C. Section 3729(a) (1)

152.     Relator repeats and realleges each allegation contained in the paragraphs above as though fully set forth herein.

153.     This is a claim for treble damages and penalties under the Federal False Claims Act, 31 U.S.C. § 3729, et seq., as amended.

154.     Through the acts described above, the Broward Health Defendants knowingly presented or caused to be presented, false claims to officers, employees or agents of the United States Government, within the meaning of 31 U.S.C. § 3729(a)(1).

155.     The United States was unaware of the falsity of the records, statements and claims made or caused to be made by the Defendants. The United States paid and continues to pay claims that would not be paid if the Defendants' unlawful conduct was known to the United States.

156.     As a result of the Broward Health Defendants' acts, the United States has sustained damages, and continues to sustain damages, in a substantial amount to be determined at trial.

157.     Additionally, the United States is entitled to a civil penalty of between

$5,500 and $11,000 for each false claim made or caused to be made by Defendants arising from their unlawful conduct as described herein.

## Count II---False Claims Act 31 U.S.C. 3729(a) (2) Use of False Statements

158.    Relator repeats and realleges each allegation contained in the paragraphs above as though fully set forth herein.

159.    This is a claim for treble damages and penalties under the Federal False Claims Act, 31 U.S.C. § 3729, et seq., as amended.

160.    Through the acts described above, the Broward Health Defendants knowingly made, used, or caused to be made or used, false records and statements, i.e., the false certifications made by Defendants in submitting the cost reports after each fiscal year to get false or fraudulent claims paid or approved by the United States.

161.    Through the acts described above, the Broward Health Defendants knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to get false claims paid or approved, within the meaning of 31 U.S.C. § 3729(a)(2).

162.    The Defendants made, used, or caused to be made or used false records or statements with the intent to get or cause these false and fraudulent claims to be paid by the United States.

163.    The United States was unaware of the falsity of the records, statements, certifications and claims made or caused to be made by the Defendants. The United States paid and continues to pay claims that would not be paid if the Defendants' unlawful conduct was known.

164.    By virtue of the false records or false claims made by the Defendants, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act to be determined at trial.

165.    Additionally, the United States is entitled to civil penalties between $5,500 and $11,000 for each false claim made and caused to be made by Defendants arising from their unlawful conduct as described herein.

## Count III---Federal False Claims Act 31 U.S.C. § 3729(a) (3)

166.    Relator repeats and realleges each allegation contained in the paragraphs above as though fully set forth herein.

167.    This is a claim for penalties and treble damages under the False Claims Act, 31 U.S.C. § 3729, et seq., as amended.

168.    Through the acts described above, the Broward Health Defendants, acting in concert with each other and other contractors, agents, partners, and/or representatives, conspired to knowingly present or cause to be presented, false claims to the United States and knowingly made, used, or caused to be made or used, false records and statements, and omitting

material facts, to get false claims paid or approved.

169.    As a result, the United States was unaware of the false claims caused by Defendants and the United States paid and continues to pay claims that would not be paid if the Defendants' unlawful conduct was known to the United States.

170.    By reason of the Broward Health Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

171.    By virtue of Defendants' conspiracy to defraud the United States, the United States sustained damages and is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## Count IV---False Claims Act 31 U.S.C. 3729 (a) (7) False Record to Avoid an Obligation to Refund

172.    Relator repeats and realleges each allegation contained in the paragraphs above as though fully set forth herein

173.    Defendants knowingly made and used, or caused to be made or used, false records or false statements, i.e., the false certifications made or caused to be made by Defendants in submitting the cost reports, to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United

States.

174.     By virtue of the false records or false statements made by the

Defendants, the United States sustained damages and therefore is entitled to

treble damages under the False Claims Act, to be determined at trial, plus a

civil penalty of $5,500 to $11,000 for each violation.

### Prayers for Relief

On behalf of the United States, Dr. Reilly requests and prays that

judgment be entered against Defendants in the amount of the United States'

damages, trebled as required by law, and such civil penalties as are required by

law, for a qui tam relator's share as specified by 31 U.S.C. §3730, for attorneys

fees, costs and expenses as provided by 31 U.S.C. §3730, and for all such

further legal and equitable relief as may be just and proper.

### JURY TRIAL IS HEREBY DEMANDED.

Respectfully submitted, this the 15th day of November, 2010.

Bryan A. Vroon, Esq. (Pro Hac Admission
Motion to be filed)
Georgia Bar No. 729086
Law Offices of Bryan A. Vroon, LLC
1718 Peachtree Street, Suite 1088
Atlanta, Georgia  30309
Telephone: (404) 607-6712
Facsimile:  (404) 607-6711

bvroon@vroonlaw.com

Theodore J. Leopold (FBN 705608)
Leopold~Kuvin, P.A.
2925 PGA Boulevard, Suite 200
Palm Beach Gardens, FL 33410
561-935-4801- Telephone
561-515-1401 – Fax
tleopold@leopoldkuvin.com

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the within and foregoing Qui Tam Relator's First Amended Complaint Under 31 U.S.C. §3729, Federal False Claims Act by depositing a true and correct copy of same by Certified Mail in the United States Mail, postage prepaid, addressed as follows:

Attorney General Eric H. Holder
Attorney General of the United States
5111 Main Justice Building
10th & Constitution Avenue, N.W.
Washington, D.C.  20210

Wifredo A. Ferrer
United States Attorney
For the Southern District of Florida
99 NE 4th Street
Miami Florida
33132

David T. Cohen
United States Department of Justice
601 D Street, NW, Room 9026
Washington, D.C.  20004

Mark Lavine
Assistant United States Attorney
For the Southern District of Florida
99 NE 4th Street
Miami Florida
33132

This 15th day of November, 2010.

THEODORE J. LEOPOLD