IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF FLORIDA

CIVIL DIVISION

UNITED STATES OF AMERICA
*ex rel.*
MICHAEL REILLY, M.D.,

CASE NO. **10-60590-Cv-Martinez/Brown**

Relator

**TO BE FILED IN**
**CAMERA AND UNDER SEAL**

vs.

DO NOT PUT IN PRESS BOX

DO NOT ENTER ON PACER

NORTH BROWARD HOSPITAL
DISTRICT d/b/a BROWARD HEALTH,
BROWARD GENERAL MEDICAL CENTER,
AND JOHN DOES 1-100

Defendants.

## RELATOR'S THIRD AMENDED COMPLAINT UNDER FEDERAL FALSE CLAIMS ACT

Introduction ........................................................................................................ 5

Parties ................................................................................................................ 10

Jurisdiction and Venue ...................................................................................... 12

Introduction to Federal *Stark* Laws ................................................................. 14

The *Stark* Statute's Broad Definition of "Referral" ...................................... 18

A Bona Fide Employment Relationship Must Satisfy Four Primary
Requirements ...................................................................................................... 19

Physician Compensation Must be "Consistent with the Fair Market Value
of the Services" Personally Performed by the Physician .................................. 20

Compensation Must Not be "Determined in a Manner that Takes into
Account (Directly or Indirectly) the Volume or Value of any Referrals by

the Referring Physician" ...................................................................... 22

The *Stark* Statute Requires that Physician Compensation Must be "Commercially Reasonable Even if No Referrals were Made to the Employer" ......................................................................................... 23

The Anti-Kickback Statute Also Mandates that a Hospital's Determination of Compensation to an Employed Physician Must be Consistent with the Fair Market Value of the Physician's Services and Must Not Take Into Account the Volume or Value of Referrals to the Hospital .................................... 24

Introduction to Excessive Physician Compensation Paid by Broward Health Based in Part on the Value and Volume of Referrals ............................................. 27

Over the Past Nine Years, the Overcompensation of the Employed Orthopedic Surgeons Has Generated Net Operating Losses in Excess of 40 Million Dollars Which Have Been Offset by Millions of Dollars in Referral Profits Monitored by Broward Health ...................................................................... 32

Mid-Way through Fiscal Year 2011, the Overcompensation of the Orthopedics Group Generated Net Losses of $2,482,446 Offset by Approximately 3.6 Million Dollars in Referral Profits Monitored by Broward Health .............................................................................................. 34

In Fiscal Year 2009 Broward Health Followed the Same Scheme of Over-Compensating Its Orthopedic Surgeons to Generate Significant Losses Offset by Referral Profits ......................................................................... 35

Year after Year, Broward Health Has Chosen to Continue Overcompensating the Orthopedic Surgeons to Generate Massive Losses While It Tracks Offsetting Referral Profits ......................................................... 40

Broward Health's CEO Has Admitted Broward Health's Focus on Ancillary Referral Profits from the Orthopedic Surgeons ................................... 41

Broward Health Has Pressured the Orthopedic Surgeons for More Referrals Even When Patient Care Was Compromised ...................................... 42

Even in the Presence of Concerns Raised by Dr. Reilly, Broward Health Deliberately Ignored Such Concerns, Made False Public Assurances, and Proceeded to Deliberately Violate Federal Stark Laws Over the Next 8 Years .................................................................................................. 42

Broward Health Has Employed the Same Strategy of Recruiting, Employing, and Compensating Cardiologists Based in Part on the Value and Volume of Referral Revenues ......................................................................................... 46

Mid-Way through Fiscal Year 2011, the Overcompensation of the

Employed Cardiologists Generated Net Losses of $3,444,332 Offset by Referral Profits Monitored by Broward Health ................................................... 48

In Fiscal Year 2009, Broward Health Employed the Same Scheme of Over-Compensating Employed Cardiologists to Generate Significant Losses While Broward Health Anticipated, Tracked, and Allocated Referral Profits for Each Cardiologist ................................................................ 49

To Boost Physician Compensation for Referrals, Broward Health Has Paid Numerous Cardiologists under Sham "Medical Director" Contracts While Requiring Little or No Substantive Work ........................................................... 52

For Every Employed Cardiologist, Broward Health Has Determined Compensation Based in Part on Anticipated Referrals Which Are Closely Monitored by Broward Health ......................................................................... 53

Broward Health Has Knowingly Paid Orthopedic Surgeons and Cardiologists Based on Inflated RVUs ................................................................ 57

Broward Health's Excessive Physician Compensation Based in Part on the Volume and Value of Referrals Has Spanned All Practice Areas and Continued into Fiscal Year 2011 ......................................................................... 65

Mid-Way through Fiscal Year 2011, Profits From Referrals by Employed Physicians to Broward Health Hospitals and Clinics Changed the Net Operating Losses of Approximately 10.5 Million Dollars into Net Profits of Approximately 5.9 Million Dollars ................................................................ 67

Mid-way through Fiscal Year 2011, the Overcompensation of the Primary Care Practice Group Generated Net Losses of $1,158,845 Offset by Referral Profits of Approximately 4.3 Million Dollars Monitored by Broward Health .............................................................................................. 68

Mid-way through Fiscal Year 2011, the Overcompensation of the Hematology/Oncology Group Generated Net Losses of $1,346,002 Offset by Approximately 4.7 Million Dollars in Referral Profits Monitored by Broward Health .............................................................................................. 70

Mid-way through Fiscal Year 2011, the Overcompensation of the "Other" Category of Employed Physicians Generated Net Operating Losses of $2,069,748 Offset by Approximately 1.3 Million Dollars in Referral Profits Monitored by Broward Health ................................................................ 71

Throughout the Broward Health System, Broward Health Has Implemented a Scheme to Compensate Employed Physicians Based In Part on the Value and Volume of Inpatient and Outpatient Referrals ................................................. 72

Broward General Medical Center........................................................ 74

North Broward Medical Center .......................................................... 75

Imperial Point Medical Center .......................................................... 76

For Fiscal Year 2009, Broward Health Deliberately Paid Excessive Physician Compensation to Generate Net Operating Losses of Approximately $17,479,732 Offset by Approximately 28 Million Dollars in Referral Profits .......................................................................... 78

Broward Health's Current Focus on Recruiting, Employing, and Compensating Primary Care Physicians with the Highest Referrals to Broward Health Hospitals ...................................................................... 82

The Massive Losses from Physician Practice Groups Are Not Justified by Such Physicians' Charity Care .......................................................... 83

Federal Healthcare Programs .............................................................. 85

Introduction to the Medicare Program................................................ 85

Introduction to Medicaid Program...................................................... 92

Introduction to TRICARE................................................................... 94

Introduction to the False Claims Act.................................................. 96

Certifying Compliance with the Federal *Stark* Laws and Anti-Kickback Statutes Is Condition of Payment Under Federal Healthcare Programs and False Certifications are Actionable under the False Claims Act.......................... 102

Model of Damages to the Federal Government .................................... 105

Total Projected Principal Damages to the Medicare and Medicaid Programs Arising from Tainted Referrals from All Employed Physician Practice Groups for Fiscal Years 2004-2011 ........................................ 108

Potential Statutory Fines for the Tainted Claims................................. 108

Summary of Damages Model Calculations ........................................ 109

Count I---Federal False Claims Act 31 U.S.C. Section 3729(a) (1)(A)................ 110

Count II---False Claims Act 31 U.S.C. 3729(a)(1)(B) Use of False Statements....................................................................................... 111

Count III---Federal False Claims Act 31 U.S.C. § 3729(a)(1)(C) Conspiring to Submit False Claims.................................................................... 113

Count IV---Submission of Express and Implied False Certifications in Violation of 31 U.S.C. § 3729(a)(1)(B) .............................................. 114

Count V---Knowingly Causing and Retaining Overpayments in Violation of

31 U.S.C. § 3729(a)(1)(G)..........................................................................115

Count VI---False Claims Act 31 U.S.C. 3729 (a)(1)(G) False Record to Avoid an Obligation to Refund .........................................................................117

Prayers for Relief..........................................................................................117

## Introduction

1.      Under Rule 15 of the Federal Rules of Civil Procedure and under the Federal False Claims Act, 31 U.S.C. § 3729 et seq. ("FCA"), Dr. Reilly states his Third Amended Complaint against Defendants North Broward Hospital District d/b/a Broward Health and Broward General Medical Center (collectively referred to as "Broward Health" or "the Broward Health Defendants") filed under seal with the Court as follows.

2.      With limited exceptions, Federal *Stark* Law provides that if a physician has a financial relationship with a hospital or entity, then:

> (A) The physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and
> (B) the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under sub paragraph (A).

42 U.S.C. § 1395nn (a)(1).

3.      In addition to prohibiting the hospital from submitting claims under these

circumstances, the *Stark* Law also prohibits payments by Federal Healthcare Programs of such claims: "No payment may be made under this subchapter for a designated health service which is provided in violation of subsection (a)(1) of this section." 42 U.S.C. §1395nn (g)(1).[1]

4.      "Under Section 1877, if a physician or a member of the physician's immediate family has a financial relationship with a health care entity, the physician may not make referrals to that entity for the furnishing of designated health services (DHS) under the Medicare program, unless an exception applies." 66 Federal Register 944 (January 4, 2001).

5.      Prior to enactment of the *Stark* Laws, "there were a number of studies…that consistently found that physicians who had [financial relationships with]…entities to which they referred, ordered more services than physicians without those financial relationships…" 66 Federal Register 859 (January 4, 2001).   "This correlation between financial ties and increased utilization was the impetus for section 1877 of the Act." 66 Federal Register 859 (January 4, 2001).

6.      A hospital employing and compensating a physician who refers patients

---

[1] "Designated health services" include "any of the following items or services: "clinical laboratory services, physical therapy services, occupational therapy services, radiology services…radiation therapy services and supplies, durable medical equipment and supplies, parenteral and enteral nutrients, equipment and supplies, prosthetics, orthotics and prosthetic devices and supplies, home health services, outpatient prescription drugs, inpatient and outpatient hospital services." 42 U.S.C. §1395nn (h)(6).

covered by Federal Healthcare Programs to that hospital must satisfy the statutory exception for "bona fide employment relationships."

7.     Under the *Stark* Statute, a "bona fide employment relationship" must satisfy the following three relevant requirements: (1) "the amount of the remuneration under the employment....is consistent with the fair market value of the services" personally performed by the physician, (2) the remuneration "is not determined in a manner that takes into account (directly or indirectly) the volume or value of any referrals by the referring physician," and (3) "the remuneration is provided pursuant to an agreement which would be commercially reasonable even if no referrals were made to the employer." 42 U.S.C.S. § 1395nn (e)(2). All three of these requirements are mandatory under Federal *Stark* Laws.

8.     In compensating its employed physicians from 2004 through the present, Broward Health has deliberately and repeatedly violated all three of these requirements mandated by Federal *Stark* Laws.

9.     From 2004 through the present, Broward Health's physician compensation strategy has been a scheme of mutual enrichment in which Broward Health has paid its employed physicians far in excess of the value of their personal services while Broward Health has received massive profits in inpatient and outpatient referrals from such physicians.

10.    From 2004 through the present, the Broward Health Defendants have

compensated employed physicians (1) at levels which exceeded the fair market value of their personal services, (2) at levels which were not commercially reasonable if the physicians were not in a position to generate referral business for Broward Health, and (3) at levels which were determined and paid based in part on the volume and value of inpatient and outpatient referrals by such physicians to Broward Health hospitals and clinics.

11.     Instead of complying with the *Stark* Statute's requirement that physicians' "remuneration" be "commercially reasonable even if no referrals were made to the employer," 42 U.S.C.S. § 1395nn (e)(2)m, Broward Health has done the exact opposite. Broward Health's compensation packages to employed physicians are commercially reasonable only if the physicians make significant referrals to Broward Health hospitals and clinics.   From the beginning of its employment arrangements with physicians and throughout the term of employment, Broward Health and its physicians know that referrals are driving factors in the excessive compensation.   If no referrals were made by the physicians and if referrals were not considered, then Broward Health has compensated its physicians to generate losses in excess of approximately 160 million dollars over the last 8 years according to Broward Health's internal secretive "Contribution Margin Reports" discussed below.

12.     As discussed below, Broward Health deliberately planned for such massive losses as it tracked and monitored offsetting referral profits which exceeded the losses. Broward Health's financial strategist have deliberately defied *Federal* Stark Laws and focused on the bottom line financial numbers in which referral profits exceed the losses from overcompensation.

13.     From 2004 through the present, Broward Health's financial strategists have personally profited from their scheme under a bonus compensation program based in part on revenues from inpatient admissions and outpatient visits to Broward Health hospitals and clinics. In 2003, Broward Health approved its first Management Incentive Plan which pays bonuses to its executives up to 20 percent of their salaries based in part on the financial performance of the hospital system. The Management Incentive Plan is self-funding and Broward Health must generate sufficient profits to cover the costs of the bonus payments each fiscal year.

14.     The Broward Health Defendants have knowingly and repeatedly violated Federal *Stark* and Anti-kickback laws discussed below and have knowingly submitted thousands of false claims to Federal Health Care Programs[2] which claims arose through tainted referrals from employed physicians receiving excessive compensation from Broward Health.

---

[2]Federal Healthcare Programs include patients covered under the Medicare, Medicaid, and Tri-Care Programs in addition to federal employees and retired federal employees.

15.     Under the federal False Claims Act, on behalf of the United States, Dr. Reilly seeks to recover all available damages, civil penalties, and other relief arising from the Broward Health Defendants' conduct described in this Third Amended Complaint.

## Parties

16.     Relator Michael Reilly, M.D., is a resident of Fort Lauderdale, Florida. He is an orthopedic surgeon who has held staff privileges to practice medicine at Imperial Point Medical Center, a hospital within the Broward Health system since 1989.  He formerly held staff privileges at two other Broward Health hospitals, Broward General Medical Center and North Broward Medical Center.  Dr. Reilly was personally offered employment by Broward Health under terms which presented potential violations of the Federal *Stark* laws.  Dr. Reilly declined the offer from Broward Health, but he continued to witness Broward Health's strategy to recruit, employ, and compensate physicians at excessive levels based in part on the value and volume of referrals to Broward Health hospitals and clinics.

17.     Through his work, experience, medical practice, research, and investigation into physician compensation paid by Broward Health, he has direct, personal and independent knowledge that the Broward Health Defendants have violated Federal *Stark* and Anti-Kickback Laws in compensating physicians based in part on the

volume and value of inpatient and outpatient referrals to Broward Health hospitals and clinics.

18.     The evidence of *Stark* law violations cited below by Dr. Reilly has not been publicly disclosed in any source listed under the False Claims Act or any other source. The extensive evidence of *Stark* law violations identified in detail below derive from secretive internal reports kept and concealed by Broward Health and from private communications and private admissions of Broward Health officers.

19.     Defendant North Broward Hospital District d/b/a Broward Health comprises a "nonprofit" health care system which encompasses more than 30 healthcare facilities, including Broward General Medical Center, North Broward Medical Center, Imperial Point Medical Center, Coral Springs Medical Center, and Broward Health Weston.  Broward Health and its facilities are not state agencies or "arms of the state."  Broward Health is not entitled to Eleventh Amendment immunity from liability under the False Claims Act.

20.     Defendant Broward General Medical Center is the largest of the Broward Health hospitals and the primary place of practice for physicians receiving commercially excessive compensation described in this Third Amended Complaint.

21.     The headquarters of Broward Health are located at 303 SE 17th Street Fort Lauderdale, FL 33316.  Broward Health's registered agent for service of process is

Mr. Samuel S. Goren, 303 S.E. 17th Street Ft. Lauderdale, Fl 33316.

22.     The identities of the remaining Doe defendants who knowingly submitted or caused the submission of false claims to the United States are presently unknown to Dr. Reilly.  All listed Defendants and such additional Doe defendants have served as contractors, agents, partners, and/or representatives of one and another in the submission of false claims to the United States and were acting within the course, scope and authority of such contract, conspiracy, agency, partnership and/or representation for the conduct described below.

## Jurisdiction and Venue

23.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought under 31 U.S.C. §§ 3729 and 3730.

24.     Personal jurisdiction and venue are proper in this District under 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a), as Defendants can be found, reside, transact business, or otherwise engaged in the illegal conduct at issue within the District.

25.     This action arises under the provisions of Title 31 U.S.C. § 3729, *et seq*, popularly known as the False Claims Act which provides that the United States

District Courts shall have exclusive jurisdiction over actions brought under that Act.

26.     Section 3732(a) of the Federal False Claims Act provides, "Any action under section 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred."

27.     Relator has filed this action within the 6 year statute of limitations under the False Claims Act. As discussed below, this action seeks recovery under the False Claims Act for violations of Federal *Stark* and Anti-Kickback Laws with respect to Broward Health's claims for payment by Federal Healthcare Programs arising from Fiscal Years 2004, 2005, 2006, 2007, 2008, 2009, 2010, and 2011 and continuing through the present.

28.     The Wartime Suspension of Limitations, 18 U.S.C. § 3287 (2008), provides that "the running of any statute of limitations applicable to...fraud or attempted fraud against the United States or...committed in connection with the acquisition...of any...property of the United States, or committed in connection with the negotiation, procurement, award, performance, payment for...any contract, subcontract, or purchase order which is connected with or related to the prosecution of the war...shall be suspended until 5 years after the termination of hostilities as proclaimed by a Presidential proclamation...or concurrent resolution

of Congress."

29.    The United States has been at war in Afghanistan since 2001 which is ongoing. The United States was at war in Iraq from March of 2003 when it invaded Iraq until 2011 when American troops were withdrawn.   During such wars, the statute of limitations for actions under the False Claims Act has been suspended under federal law.

30.    Dr. Reilly has complied with 31 U.S.C. §3730(b) (2) by serving a copy of the Complaint, First Amended Complaint, Second Amended Complaint, Third Amended Complaint and his written disclosures of substantially all the material evidence and information in his possession upon the United States Attorney for the Southern District of Florida and the United States Attorney General. Dr. Reilly also met with representatives of the United States Attorney's Office for the Southern District of Florida and provided notice to the Federal government prior to filing the Complaint, First Amended Complaint, Second Amended Complaint, and Third Amended Complaint under seal with the Court.

## Introduction to Federal *Stark* Laws

31.    The Federal *Stark* Law "was enacted to address over-utilization, anti-competitive behavior, and other abuses of health care services that occur when physicians have financial relationships with certain ancillary service entities to

which they refer Medicare or Medicaid patients." 69 Federal Register 16124 (March 26, 2004). "Physician financial arrangements may have some anti-competitive effects to the extent that those relationships discourage other providers from entering a market in which patients are primarily referred to physician-owned entities or DHS entities that maintain generous compensation arrangements with physicians." *Id.* "Anti-competitive behavior can increase program costs if the DHS entities with which physicians have financial relationships are favored over other, more cost-efficient providers or providers that furnish higher quality care." *Id.* "Overutilization increases program costs because Medicare (or Medicaid) pays for more items or services than are medically necessary." *Id.*

32.    "The approach taken by the Congress in enacting section 1877 of the Act is preventive because it essentially prohibits many financial arrangements between physicians and entities providing DHS." 66 Federal Register 859. "Specifically, Section 1877 of the Act imposes a blanket prohibition on the submission of Medicare claims (and payment to the States of FFP under the Medicaid program) for certain DHS when the service provider has a financial relationship with the referring physician, unless the financial relationship fits into one of several relatively specific exceptions." *Id.*

33.    Congress enacted the *Stark* Statute in two parts, commonly known as *Stark I* and *Stark II.*  Enacted in 1989, *Stark I* applied to referrals of Medicare patients for

clinical laboratory services made on or after January 1, 1992 by physicians with a prohibited financial relationship with the clinical lab provider. *See* Omnibus Budget Reconciliation Act of 1989, P.L. 101-239, § 6204.

34.    In 1993, Congress extended the *Stark* Statute (*Stark II*) to referrals for ten additional designated health services. *See* Omnibus Reconciliation Act of 1993, P.L. 103-66, § 13562, Social Security Act Amendments of 1994, P.L. 103-432, § 152.    As of January 1, 1995, *Stark II* applied to patient referrals by physicians with a prohibited financial relationship for the following ten additional "designated health services": (1) inpatient and outpatient hospital services; (2) physical therapy; (3) occupational therapy; (4) radiology; (5) radiation therapy (services and supplies); (6) durable medical equipment and supplies; (7) parenteral and enteral nutrients, equipment and supplies; (8) prosthetics orthotics, and prosthetic devices and supplies; (9) outpatient prescription drugs; and (10) home health services. *See* 42 U.S.C. § 1395nn(h)(6).

35.    The *Stark* Law broadly defines prohibited "financial relationships" to include "compensation arrangements" in which any "remuneration" is paid by a hospital to a referring physician "directly or indirectly, overtly or covertly, in cash or in kind." 42 U.S.C. § 1395nn (a)(2)(B), (h)(1); 42 C.F.R. § 411.354(c).

36.    The *Stark* Law broadly defines a prohibited "compensation arrangement":

> (A) The term "compensation arrangement" means any arrangement involving any remuneration between a

physician (or an immediate family member of such physician) and any entity other than an arrangement involving only remuneration described in subparagraph (C).

(B) The term "remuneration" includes any remuneration, directly or indirectly, overtly or covertly, in cash or in kind.

42 U.S.C. § 1395nn(h)(1).

37.   This language makes clear that Congress intended the definition of "financial relationship" to include any type of financial relationship in which physicians receive any remuneration or any kind from a hospital, directly or indirectly, overtly or covertly.

38.   The *Stark* Law provides that if a physician has a financial relationship with a hospital or entity, then:

(A) The physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and

(B) the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under sub paragraph (A).

42 U.S.C. § 1395nn (a)(1).

39.   In addition to prohibiting the hospital from submitting claims under these circumstances, the *Stark* Law also prohibits payments by Federal Healthcare Programs of such claims: "No payment may be made under this subchapter for a

designated health service which is provided in violation of subsection (a)(1) of this section." 42 U.S.C. §1395nn (g)(1).[3] If a hospital submits prohibited claims and collects payment, the regulations implementing 42 U.S.C. § 1395nn require that any entity collecting payment for a healthcare service "performed under a prohibited referral must refund all collected amounts on a timely basis." 42 C.F.R. § 411.353.

## The *Stark* Statute's Broad Definition of "Referral"

40.     The *Stark* Statute defines "referral" as "the request or establishment of a plan of care by a physician which includes the provision of designated health services." 42 U.S.C. § 1395nn (h) (5) (A).

41.     The accompanying regulations applying the *Stark* Statute also broadly define "referral" as, among other things, "a request by a physician that includes the provision of any designated health service for which payment may be made under Medicare, the establishment of a plan of care by a physician that includes the

---

[3] "Designated health services" include "any of the following items or services: "clinical laboratory services, physical therapy services, occupational therapy services, radiology services...radiation therapy services and supplies, durable medical equipment and supplies, parenteral and enteral nutrients, equipment and supplies, prosthetics, orthotics and prosthetic devices and supplies, home health services, outpatient prescription drugs, inpatient and outpatient hospital services." 42 U.S.C. §1395nn (h)(6).

provision of such a designated health service, or the certifying or recertifying of the need for such a designated health service . . . ." 42 C.F.R § 411.351. A referring physician is defined in the same regulation as "a physician who makes a referral as defined in this section or who directs another person or entity to make a referral or who controls referrals made to another person or entity." *Id.*

42.     As discussed above, the *Stark* Statute broadly defines prohibited "financial relationships" to include any "compensation" paid directly or indirectly to a referring physician. The *Stark* Statute's exceptions then identify specific transactions that will not trigger its referral and billing prohibitions. To avoid the referral and billing prohibitions in the *Stark* Statute, a hospital's financial relationship with a physician must satisfy one of the exceptions.

43.     Once the plaintiff or the government has established proof of each element of a violation under the Act, the burden shifts to the defendant to establish that the conduct was protected by an exception. If no exception applies to a *Stark* violation, then all referrals from the referring employed physician to the DHS entity are subject to prohibition.

### A Bona Fide Employment Relationship Must Satisfy Four Primary Requirements

44.     A hospital employing and compensating a physician who makes referrals to

that hospital of Medicare and Medicaid patients must satisfy the statutory exception for "bona fide employment relationships." Under the *Stark* Statute, a "bona fide employment relationship" must satisfy the following four relevant requirements: (1) the "employment is for identifiable services," (2) "the amount of the remuneration under the employment....is consistent with the fair market value of the services" personally provided by the physician, (3) the remuneration "is not determined in a manner that takes into account (directly or indirectly) the volume or value of any referrals by the referring physician," and (4) "the remuneration is provided pursuant to an agreement which would be commercially reasonable even if no referrals were made to the employer." 42 U.S.C.S. § 1395nn (e)(2).

### Physician Compensation Must be "Consistent with the Fair Market Value of the Services" Personally Performed by the Physician

45.    In pertinent part, the statutory language focuses on "the fair market value of the services" personally performed by the physician. 42 U.S.C.S. § 1395nn (e)(2).

46.    "[S]ection 1877 of the Act contemplates that physicians---whether group practice members, independent contractors or employees---**can be paid in a manner that directly correlates to their own personal labor...**" 66 Federal Register 876 (emphasis added). "In the case of...employees under the *bona fide* employment exception, the amount of compensation for personal productivity is limited to fair market value for the services they personally perform." *Id.* **"In**

other words, 'productivity,' as used in the statute, refers to the quantity and intensity of a physician's own work, but does not include the physician's fruitfulness in generating DHS performed by others…" *Id.* (emphasis added). "The fair market value standard in these exceptions acts as an additional check against inappropriate financial incentives." *Id.*

47.    The *Stark* Statute provides that "[t]he term 'fair market value' means the value in arm's length transactions, consistent with the general market value . . ." 42 U.S.C. § 1395nn(h)(3). Federal regulations amplify this definition as follows:

> Fair market value means the value in arm's-length transactions, consistent with the general market value. "General market value" means the price that an asset would bring as the result of bona fide bargaining between well-informed buyers and sellers *who are not otherwise in a position to generate business for the other party*, or the compensation that would be included in a service agreement as the result of bona fide bargaining between well-informed parties to the agreement *who are not otherwise in a position to generate business for the other party*, on the date of acquisition of the asset or at the time of the service agreement." 42 C.F.R. § 411.351 (emphasis added).

48.    The *Stark* Statute **"establishes a straightforward test that compensation arrangements should be at fair market value for the work or service**

performed....not inflated to compensate for the physician's ability to generate other revenues." 66 Fed. Reg. at 877 (emphasis added).

### Compensation Must Not be "Determined in a Manner that Takes into Account (Directly or Indirectly) the Volume or Value of any Referrals by the Referring Physician"

49.     The *Stark* Law also requires that "the amount of the remuneration under the employment....is not determined in a manner that takes into account (directly or indirectly) the volume or value of any referrals by the referring physician." 42 U.S.C.S. § 1395nn (e)(2).

50.     If physicians are paid "per service" or "per time period," the "per service" amount "must reflect fair market value at inception not taking into account the volume or value of referrals and must not change over the term of the contract based on the volume or value of DHS referrals..." 66 Federal Register 878. Compensation based on a unit of service or time must be "fair market value for services or items actually provided" and personally performed by an employed physician. 69 Federal Register 16069.

51.     Apparent fixed payments to physicians may also violate Federal *Stark* laws. "If the payments reflect or take into account non-personally performed services, they may raise concerns under the statute and would merit case-by-case determination, regardless of the apparent fixed determination." 69 Federal Register 16088.

52.     The *Stark* Statute prohibits a hospital from determining compensation "in a manner that takes into account (directly or indirectly) the volume or value of any referrals by the referring physician." 42 U.S.C.S. § 1395nn (e)(2).  As discussed below, Broward Health has repeatedly and deliberately violated this Federal law in determining compensation for its employed physicians.

### The *Stark* Statute Requires that Physician Compensation Must be "Commercially Reasonable Even if No Referrals were Made to the Employer"

53.     The *Stark* Statute also requires that the remuneration to an employed physician must be "provided pursuant to an agreement which would be commercially reasonable even if no referrals were made to the employer." 42 U.S.C.S. § 1395nn (e)(2).

54.     "An arrangement will be considered 'commercially reasonable' in the absence of referrals if the arrangement would make commercial sense if entered into by a reasonable entity of similar type and size and a reasonable physician (or family member or group practice) of similar scope and specialty, even if there were no potential DHS referrals." 69 Federal Register 16093.

55.     A negotiated agreement between interested parties does not by definition reflect fair market value. The *Stark* Laws are predicated on the recognition that, when one party is in a position to generate business for the other, negotiated agreements between such parties are often designed to disguise the payment of

compensation in excess of fair market value.

### The Anti-Kickback Statute Also Mandates that a Hospital's Determination of Compensation to an Employed Physician Must be Consistent with the Fair Market Value of the Physician's Services and Must Not Take Into Account the Volume or Value of Referrals to the Hospital

56.    The Federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), prohibits any

person or entity from offering, making or accepting payment to induce or reward

any person for referring, recommending or arranging for federally funded medical

services, including services provided under the Medicare, Medicaid, and

TRICARE programs.

57.    The Anti-Kickback Statute prohibits a hospital from offering or paying "any

remuneration…directly or indirectly, overtly or covertly, in cash or in kind to any

person to induce such person to…refer an individual to a person for the furnishing

or arranging for the furnishing of any item or service for which payment may be

made in whole or in part under a Federal health care program."   42 U.S.C. §

1320a-7b(b).

58.    The United States Department of Health and Human Services ("HHS") has

promulgated regulations specifying those payment practices that will not be subject

to criminal prosecution or provide a basis for administrative exclusion. The "Safe

Harbor" regulations, 42 C.F.R. § 1001.952, list various circumstances under which

a financial relationship between a provider and a referral source would not trigger liability under the Anti-Kickback Statute.

59.    Payments to a physician under a personal service agreement must be "set in advance, [must be]… consistent with fair market value in arms-length transactions and [must]…not [be] determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part under Medicare or a State health care program." 42 C.F.R. § 1001.952(d) (2000).

60.    The Federal Anti-Kickback Statute arose out of Congressional concern that payoffs to those who can influence health care decisions would result in goods and services being provided that are medically unnecessary, too costly, poor quality, or even harmful to a vulnerable patient population. The Anti-Kickback Statute was partially based on studies demonstrating that physicians, even those intending to act in good faith, were likely to refer significantly more patients when there is a financial incentive to generate business.

61.    To protect the integrity of Federal Healthcare Programs, and realizing the difficulty for regulators and law enforcement to review every case for medically unnecessary procedures, Congress enacted a *per se* prohibition against the payment of kickbacks in any form, regardless of whether the kickback gave rise to overutilization or poor quality of care.

62.    "If any one purpose of remuneration is to induce or reward referrals of Federal health care program business, the [Anti-kickback] statute is violated." 66 Federal Register 919 (citing *United States v. Kats*, 871 F. 2d 105 (9th Cir. 1989); *United States v. Greber*, 760 F. 2d 68(3rd Cir.), cert. denied, 474 U.S. 988 (1985)).

63.    First enacted in 1972, Congress strengthened the Anti-Kickback Statute in 1977 and 1978 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. *See* Social Security Amendments of 1972, Pub. L. No. 92-603, 242(b) and 9c); 42 U.S.C. § 1320a-7b, Medicare Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

64.    The *Stark* Laws and the Anti-Kickback Statute are "complementary and although overlapping in some aspects, not redundant." 66 Federal Register 863. "We believe the Congress intended to create an array of fraud and abuse authorities to enable the government to protect the public fisc, beneficiaries of Federal programs, and honest health care providers from the corruption of the health care system by unscrupulous providers." *Id.*   "Congress only intended [the *Stark* laws] to establish a minimum threshold for acceptable financial relationships, and that potentially abusive financial relationships that may be permitted under Section 1877 of the Act could still be addressed through other statutes that address health care fraud and abuse, including the anti-kickback statute (Section 1128B(b) of the

Act)." 66 Federal Register 860. "In some instances, financial relationships that are permitted under Section 1877 of the Act might merit prosecution under section 1128B(b) of the Act." *Id.* "Conversely, conduct that may be proscribed by Section 1877 of the Act may not violate the anti-kickback statute." *Id.*

65.     Violation of the Anti-Kickback Statute may subject the perpetrator to exclusion from participation in Federal Healthcare Programs, civil monetary penalties of $50,000 per violation, and three times the amount of remuneration paid, regardless of whether any part of the remuneration is for a legitimate purpose. 42 U.S.C. § 1320-7(b) (7) and 42 U.S.C. § 1320a-7a (a) (7).

## Introduction to Excessive Physician Compensation Paid by Broward Health Based in Part on the Value and Volume of Referrals

66.     As mentioned above, under the Federal *Stark* Laws, a "bona fide employment relationship" must satisfy the following three relevant requirements: (1) "the amount of the remuneration under the employment....**is consistent with the fair market value of the services,**" (2) the remuneration **"is not determined in a manner that takes into account (directly or indirectly) the volume or value of any referrals by the referring physician,"** and (3) **"the remuneration is provided pursuant to an agreement which would be commercially**

reasonable even if no referrals were made to the employer." 42 U.S.C.S. §§ 1395nn (e)(2) (Emphasis added).

67.    In their schemes to compensate employed physicians between 2004 and the present, the Broward Health Defendants have deliberately and repeatedly violated all three of these requirements of Federal *Stark* Laws.

68.    The excessive compensation given by the Broward Health Defendants to employed physicians has spanned all physician practice groups from Fiscal Year 2004 through the present.

69.    From 2004 through the present, before hiring a physician, Broward Health has typically projected the value and volume of anticipated referrals by that physician to Broward Health hospitals and clinics. Broward Health's financial strategists have typically used the value and volume of anticipated inpatient and outpatient referrals as factors in determining physician compensation. Employed physicians know that the value and volume of their anticipated referrals to Broward Health are factors which contribute to the compensation packages offered by Broward Health.

70.    Throughout the employment period of each physician, Broward Health has tracked and monitored the value and volume of referrals from each physician in

secretive "Contribution Margin Reports."[4] If the value and volume of referrals did not offset the excessive physician compensation, then Broward Health pressured particular physicians with deficient referrals for increased referrals to Broward Health hospitals and clinics.

71.    In the secretive Contribution Margin Reports, Broward Health has also tracked uncompensated referrals from each employed physician and each practice group.   Broward Health has received reimbursement for every uncompensated admission and every uncompensated outpatient visit through Broward County tax dollars at the rate of 75 percent of direct costs. With respect to the remaining 25 percent of direct costs, Broward Health's Contribution Margin System for each physician penalizes the referring physicians by deducting such 25 percent of direct costs from the physician's contribution margins.

72.    Not only has Broward Health tracked and monitored referrals of compensated cases by each employed physician. Broward Health has also tracked and monitored referrals of charity cases and has used such data to discourage employed physicians from making significant charity referrals which will reduce their contribution margins.

73.    Broward Health's scheme to reward referrals by employed physicians has not been limited to referrals of patients with commercial insurance. The

_____

[4]"Contribution margins" are Broward Health's accounting nomenclature used to describe referral profits.

"contribution margins" projected, calculated, and monitored by Broward Health for each practice and each employed physician have included profits from referrals of both Medicare and Medicaid patients to Broward Health hospitals and clinics.

74.    The Contribution Margin Reports regularly run by Broward Health for each employed physician and each practice group[5] are kept in secret by Broward Health's financial strategists who have recruited physicians and determined their compensation terms.   In private meetings closed from public attendance, Brian Ulery, Broward Health's former Vice-President of Physician Services, has touted the secretive Contribution Margin Reports run by Broward Health's financial strategists for every physician. Mr. Ulery confirmed that the Contribution Margin Reports are concealed and "not listed in our financials." [6]

75.    At a private strategic planning meeting of Broward Health's officers and Commissioners in the spring of 2011, Mr. Ulery stated that the secretive Contribution Margin Reports reveal "the revenue that we receive from every admission, every ancillary, anything that's done to patients" of employed physicians.  **Mr. Ulery stated that the "ancillary" revenues "take out the loss of**

---

[5]   On its secretive Contribution Margin Reports, Broward Health divides its employed physicians into five practice groups: primary care, cardiology, hematology/oncology, orthopedics, and other.

[6] Mr. Ulery was Broward Health's Vice-President of Physician Services from 2007 until October of 2011. He resigned approximately four months after Broward Health received a subpoena from the Office of Inspector General in this action.

our practices" and "that's what we need to focus on." (emphasis added).

76.     Broward Health's strategic scheme of paying employed physicians more than fair market value and more than they can ever hope to collect for their personal services is not a commercially sustainable business model. This practice is only sustainable by anticipating and allocating hospital referral profits to cover the massive direct losses from excessive physician compensation.

77.     As discussed further below, the conduct of Broward Health's financial strategists responsible for physician recruitment and compensation evidence the following four primary facts: (1) Broward Health has deliberately recruited, employed, and agreed to pay physicians based in part on anticipated profits from referrals from such physicians to Broward Health hospitals and clinics, (2) Broward Health has not simply compensated employed physicians based on the value of the physicians' personally performed services and revenue from such services, (3) Broward Health has deliberately planned and budgeted for massive net operating losses from the overcompensation of employed physicians while secretly tracking profits from referrals by such physicians to Broward Health hospitals and clinics, and (4) Broward Health has deliberately compensated its employed physicians at commercially unreasonable levels if profits from referrals by such physicians were not considered.

**Over the Past Nine Years, the Overcompensation of the Employed Orthopedic Surgeons Has Generated Net Operating Losses in Excess of 40 Million Dollars Which Have Been Offset by Millions of Dollars in Referral Profits Monitored by Broward Health**

78.    Dr. Reilly has provided the Department of Justice with copies of the secretive Contribution Margin Reports kept by Broward Health's financial strategists for multiple years.  These Contribution Margin Reports evidence the implementation of Broward Health's scheme to compensate physicians based in part on the value and volume of referrals. These Contribution Margin Reports reveal that Broward Health has deliberately implemented a scheme to boost referrals through compensating physicians at excessive levels while Broward Health tracked and monitored offsetting referral profits.

79.    The amounts of operating losses caused by Broward Health's overcompensation of employed physicians and the amounts of offsetting inpatient and outpatient profits from referrals by employed physicians cited in this Third Amended Complaint come directly from Broward Health's secretive Contribution Margin Reports.

80.    For example, in Fiscal Year 2011 as of December, the secretive Contribution Margin Reports revealed that the employed orthopedic surgeons generated collections of $3,229,793. In the Contribution Margin Reports, Broward Health determined their practice overhead was $5,712,239. The percent of the practice

group overhead to collections for the employed Orthopedics Group was 176 percent.

81.    For Fiscal Year 2011, the orthopedic surgeons' "charity care" was trivial and had no material impact on the exorbitant compensation to collections ratio. Under the PPUC Program[7] at Broward Health which used county tax dollars to reimburse physicians for the care of any indigent patients or uncompensated cases at 70 percent of the Medicare rates, the orthopedic surgeons generated only $16,196 for such indigent services and $119,000 for "on call" services mid-way through Fiscal Year 2011 as of December of 2010.

82.    Mid-way through Fiscal Year 2011, Broward Health calculated the "net loss" from the Orthopedics Practice Group operations as $2,482,446. **The excessive compensation of the employed orthopedic surgeons was on pace to generate losses of $4,964,892 for Fiscal Year 2011.**

---

[7]   In 1973 the Board of Commissioners of North Broward Hospital District established the Physician Payment for Uncompensated Care Program ("PPUC") which paid physicians on a fee-for-service basis for the care of indigent patients who require hospitalization in the medical centers of the District. Over the years the program was expanded so that physicians taking call in the Emergency Department or other approved Broward Health clinics many collect a fee for indigent cases they treat as a result of taking call. In addition, patients who are admitted under the program and who require follow-up inpatient or outpatient hospital care related to the initial service will be covered under the program.

### **Mid-Way through Fiscal Year 2011, the Overcompensation of the Orthopedics Group Generated Net Losses of $2,482,446 Offset by Approximately 3.6 Million Dollars in Referral Profits Monitored by Broward Health**

83.     Broward Health knew and has been repeatedly reminded in its secretive Contribution Margin Reports that excessive compensation of the orthopedic surgeons would cause and had caused significant net operating losses year after year without considering referral revenues. Broward Health planned and budgeted for such major losses while monitoring offsetting referral profits from such physicians to Broward Health hospitals and clinics.

84.     In the secretive Contribution Margin Reports mid-way through Fiscal Year 2011, Broward Health monitored the value and volume of referrals from each practice group including the employed orthopedic surgeons.

85.     Broward Health tracked hospital profits from inpatient referrals by its employed orthopedists in the amount of $1,341,280 and hospital profits from outpatient referrals by its employed orthopedists in the amount of $2,318,359. Broward Health tracked 335 inpatient cases referred by its employed orthopedists and 2,436 outpatient cases. After tracking profits from referrals by its employed orthopedic surgeons to Broward Health hospitals and clinics, Broward Health calculated a "Physician Practice & Med Ctr Contribution Compensated Care" for the Orthopedics Group to be a net gain of $1,177,193.  After considering the PPUC

34

and on call benefit payments attributed to the Orthopedics Practice Group, the "Total Contribution Margin" calculated by Broward Health for the Orthopedics Practice Group was a net gain of $1,312,389.

### In Fiscal Year 2009 Broward Health Followed the Same Scheme of Over-Compensating Its Orthopedic Surgeons to Generate Significant Losses Offset by Referral Profits

86.     In the secretive Contribution Margin Reports, Broward Health has regularly performed extensive financial analyses of the value and volume of inpatient and outpatient referrals from each orthopedic surgeon to Broward Health hospitals and clinics.

87.     For example, at the end of Fiscal Year 2009 (June), Broward Health performed such analyses of Dr. Yoldas which showed that in evaluating the net revenue and expenses of his personal practice, Broward Health faced a net loss of $791,630 for that fiscal year.  Dr. Yoldas' "net operating revenue" as determined by Broward Health was $1,296,484 as of June in Fiscal Year 2009.  However, "expenses" from his practice, including his compensation and overhead, totaled $2,088,114.

88.     Broward Health paid Dr. Yoldas approximately $1,391,184.23 in 2008 and $1,557,984.40 in 2009, despite the fact that the 90th percentile (the highest percentile category) salary for orthopedic surgery-sports medicine in the United States $1,031,512 in 2008 and $1,073,486 in 2009. (*See* 2009 MGMA Physician

Compensation and Production Survey, Table 103A and 2010 MGMA Physician Compensation and Production Survey, Table 1). In 2009, Broward Health paid Dr. Yoldas nearly $500,000 over the national 90th percentile for sports medicine orthopedic surgeons.

89.     According to the Contribution Margin Reports, Dr. Yoldas' compensation to collections ratio for 2009 was 1.20 as compared to the national 90th percentile of .835 reported in the 2010 MGMA Physician Compensation and Production Survey. The ratio of practice overhead to collections for Dr. Yoldas was 1.61 in Fiscal Year 2009.

90.     As Broward Health secretly tracked and monitored "inpatient contribution margins" and "outpatient contribution margins" from referrals by this orthopedic surgeon to Broward Health hospitals and clinics, the total "contribution margin" was a profit of $867,326. Broward Health agreed to employ and to pay this orthopedic surgeon in anticipation of referral revenues which Broward Health closely tracked and monitored in secretive internal reports.

91.     Dr. Yoldas' "Total Contribution Margin" was reduced by Broward Health because he referred uncompensated cases with direct costs of $39,131 and Broward County tax dollars paid $29,348 of such costs. Broward Health penalized Dr. Yoldas' "contribution margins" for the difference of $9,783.

92.     Not only has Broward Health created a system which anticipates, projects,

tracks, and monitors profits from referrals from employed physicians to Broward Health hospitals. It has also created a system which tracks, monitors, and discourages referrals of uncompensated cases and tallies such uncompensated cases against individual physicians making such referrals.

93.     In June of 2009, Broward Health performed an identical secretive financial analysis of Dr. Caldwell which showed that in evaluating the net revenue and expenses of his personal practice, Broward Health faced a net loss of $814,007 for Fiscal Year 2009. This surgeon's "net operating revenue" as determined by Broward Health was $1,142,810. However, "expenses" from his practice, including his compensation and overhead, totaled $1,956,817.

94.     The collections for Dr. Caldwell's services were just over the national 50th percentile which was $1,044,382 in 2009. Yet Broward Health paid Dr. Caldwell well in excess of the national 90th percentile in compensation.

95.     Broward Health paid Dr. Caldwell at least $1,373,304.73 in 2008 and $1,424,356.85 in 2009, despite the fact that the 90th percentile (the highest percentile category) salary for orthopedic surgery-sports medicine in the United States $1,031,512 in 2008 and $1,073,486 in 2009. (See 2010 MGMA Physician Compensation and Production Survey, Table 1 and 2009 MGMA Physician Compensation and Production Survey, Table 103A).

96.     Broward Health's secretive Contribution Margin Reports reveal that Dr.

Caldwell's compensation to collections ratio for 2009 was 1.24 as compared to the national 90th percentile for sports medicine orthopedic surgeons of .835 as reported in the MGMA 2010 Physician Compensation and Production Survey. The ratio of practice overhead to collections for Dr. Caldwell was 1.71 in Fiscal Year 2009.

97.    In the Contribution Margin Reports, Broward Health evaluated "inpatient contribution margins" and "outpatient contribution margins" from referrals by this orthopedic surgeon to Broward Health hospitals. The significant net losses from Dr. Caldwell's excessive compensation were reversed and the total contribution margin calculated by Broward Health was a gain or profit of $38,521.

98.    Dr. Caldwell's "Total Contribution Margin" was reduced by Broward Health because he referred uncompensated cases with direct costs of $47,992 and Broward County tax dollars paid $35,994 of such costs. Broward Health penalized Dr. Caldwell's "contribution margins" for the difference of $11,998.

99.    Broward Health agreed to employ and agreed to financial terms which have paid this surgeon in excess of the 90th percentile of physician compensation in anticipation of referral revenues regularly tracked and monitored by Broward Health in secretive internal reports.

100.   Throughout each fiscal year and at the end of each fiscal year, Broward Health has commonly conducted similar analyses to evaluate the volume and value of referrals from each employed physician. At the end of Fiscal Year 2009 (June),

Broward Health performed an identical analysis of referral profits from Dr. Kanell, an orthopedic surgeon, In evaluating the net revenue and expenses of his personal practice, Broward Health faced a net loss of $577,794 for that fiscal year. Dr. Kanell's "net operating revenue" as determined by Broward Health was $708,294. However, "expenses" from his practice, which was primarily compensation, totaled $1,286,088. The ratio of practice overhead to collections for Dr. Kanell was 1.81 in Fiscal Year 2009.

101.   As Broward Health secretly monitored "inpatient contribution margins" and "outpatient contribution margins" from referrals by this orthopedic surgeon to Broward Health hospitals and clinics, Broward Health tracked 509 outpatient referrals with a profit margin of $716,089 which offset the net operating losses caused by Dr. Kanell's compensation.  The total "contribution margin" was a profit of $136,679. Broward Health agreed to employ and to pay this orthopedic surgeon in anticipation of referral revenues which Broward Health closely tracked and monitored in secretive internal reports.

102.   Dr. Kanell's "Total Contribution Margin" was reduced by Broward Health because he referred uncompensated cases with direct costs of $6,465 and Broward County tax dollars paid $4,849 of such costs. Broward Health penalized Dr. Kanell's "contribution margins" for the difference.

### Year after Year, Broward Health Has Chosen to Continue Overcompensating the Orthopedic Surgeons to Generate Massive Losses While It Tracks Offsetting Referral Profits

103.   Averaging the net annual losses on Contribution Margin Reports from 2007, 2008, and 2011 equals net losses of $2,764,535 per year for the Orthopedics Group. Projecting this average over the 9 year contract term yields total estimated net losses of $24,880,821. This estimate does not include the expenses "of between $1.5 and $2.5 million in start-up capital" and does not include the 12 million dollar expense recently approved for the new office building promised by Broward Health in the employment contracts with the orthopedic surgeons hired in 2004.

104.   The employment contracts with the orthopedic surgeons provide that Broward Health has the option of terminating the agreements "without cause with three-hundred sixty-five (365) days written notice." After tracking the millions of dollars in net operating losses caused by overcompensation of the employed orthopedic surgeons, Broward Health has had the contractual option to terminate the contracts without cause at any time with 365 days notice. Yet Broward Health has never exercised that option.

105.   Despite the massive operating losses, Broward Health has chosen year after year to continue such employment terms as it has tracked the lucrative offsetting referral profits from the orthopedic surgeons.

106.   Broward Health has deliberately chosen to pay the orthopedic surgeons in

excess of the 90th percentile according to the MGMA Physician Compensation and Production Surveys. There is one major reason for Broward Health's excessive compensation of such physician practice groups to generate massive losses: **profits from referrals to Broward Health hospitals and clinics.**

107.   Broward Health did not make an innocent bad business deal that they have been stuck in for nine years. Rather Broward Health designed the deal. They projected and knew there would be massive losses while they deliberately targeted and tracked offsetting referral profits.

108.   Despite the massive losses, Broward Health has deliberately chosen to over-pay its orthopedic surgeons because they generate significant numbers of referrals of compensated cases to Broward Health hospitals and insignificant numbers of referrals of uncompensated cases.

### Broward Health's CEO Has Admitted Broward Health's Focus on Ancillary Referral Profits from the Orthopedic Surgeons

109.   On May 27, 2009, Dr. Reilly had a private conversation with Frank Nask, Broward Health's CEO, regarding the excessive salaries paid to the sports medicine orthopedic surgeons. Dr. Reilly questioned why the orthopedic surgeons were being paid at such high levels to cause major operating losses each year. Mr. Nask did not dispute the losses, but responded, "We are making money off these guys.   These numbers don't include what they're bringing in with labs, P.T.,

41

diagnostics etc."  Mr. Nask further stated to Dr. Reilly, "'you didn't include the ancillaries in the final figure."

### Broward Health Has Pressured the Orthopedic Surgeons for More Referrals Even When Patient Care Was Compromised

110.  Broward Health's pressure on physicians to generate more referrals has extended to situations in which patient care was compromised.  When employed orthopedic surgeons had significant concerns regarding the quality of Broward Health's radiology and MRI imaging services and chose to refer patients to other facilities for such services, Broward Health's financial strategists pressured the orthopedic surgeons to continue making referrals of all radiology services to Broward Health facilities. Such pressure violated 42 C.F.R. § 411.354(d)(4)(iv)(B) which states that any requirement to refer to a particular provider does not apply if "the referral is not in the patient's best medical interests in the physician's judgment."

### Even in the Presence of Concerns Raised by Dr. Reilly, Broward Health Deliberately Ignored Such Concerns, Made False Public Assurances, and Proceeded to Deliberately Violate Federal Stark Laws Over the Next 8 Years

111.  Broward Health's scheme to overcompensate physicians in exchange for referrals over the last eight years has been a deliberate strategic plan to boost hospital admissions and outpatient visits for all paying patients, including patients

with Medicare and Medicaid coverage. Broward Health's financial strategists have personally profited from bonus payments based in part on hospital revenues. They deliberately chose to defy Federal *Stark* laws in their pursuit of increased market shares of inpatient admissions, outpatient visits, and the attendant increased profits and bonuses.

112.   In 2003 and 2004, Dr. Reilly opposed the compensation terms being considered by Broward Health for orthopedic surgeons Dr. Kanell, Dr. Yoldas, and Dr. Caldwell prior to their employment.  Dr. Reilly informed the Broward Health Board about his concerns that the compensation packages being considered for these orthopedic surgeons were excessive and could potentially violate Federal *Stark* Laws. Broward Health's counsel told Dr. Reilly that his concerns were "helpful" and that Broward Health was still doing its "diligence" to determine the compensation terms for the orthopedic surgeons and would consider Dr. Reilly's concerns.

113.   One reason that Dr. Reilly raised these concerns to the Broward Health Board was because Broward Health's internal Pro Forma indicated that it was considering employing and compensating these orthopedic surgeons based in part on the value of anticipated referrals from these physicians to Broward Health hospitals and clinics. The Pro Forma, if it became the basis for an agreement with these three orthopedic surgeons, demonstrated that the aggregate compensation

under consideration by Broward Health to these three orthopedic surgeons took into account the anticipated value of referrals generated by these physicians to Broward Health hospitals and clinics and that if such referral profits were not considered, the compensation terms would result in massive net operating losses to Broward Health.

114.   After Dr. Reilly raised these concerns, in March of 2004, Broward Health's Chief Financial Officer publicly admitted that the Pro Forma which considered ancillary referral profits was "improper" and would not be used in determining compensation for the orthopedic surgeons.   Broward Health's spokeswoman publicly stated that the Pro Forma which considered referral profits was "null and void."

115.   In an interview published in June of 2004, Broward Health's Chief Financial Officer publicly stated that the Pro Forma's reference to "ancillary revenue" was "an oversight" and the numbers were revised before the Broward Health Board approved the contracts with the orthopedic surgeons. Such assurances by the Broward Health CFO were deliberately deceptive.

116.   From the beginning of the employment contracts entered in 2004 with Dr. Caldwell, Dr. Kanell, and Dr. Yoldas, Broward Health was on notice of potential *Stark* Law violations because Dr. Reilly raised his concerns directly to the Broward Health Board.   After Dr. Reilly raised his concerns, Broward Health admitted that

the Pro Forma for physician compensation which tracked ancillary referral profits was "improper."

117. Yet despite Dr. Reilly's expressions of concern before the contracts were entered, despite Broward Health's assurances that it would consider those concerns before finalizing any contract, despite Broward Health's admission that consideration of referral profits was "improper," and despite Broward Health's public relations strategy to excuse the reference to referral profits as an "oversight," Broward Health nevertheless secretly operated contrary to its public assurances and deliberately defied Federal *Stark* Laws over the next 8 years. Broward Health has repeatedly determined physician compensation based in part on anticipated referral profits and then has closely monitored such profits throughout their physicians' employment.

118. In the subsequent years, when Dr. Reilly obtained the secretive Contribution Margin Reports kept by Broward Health, Dr. Reilly's earlier concerns about potential future violations of *Stark* laws became convictions about actual violations which had now occurred and were ongoing at Broward Health. The compensation to the orthopedic surgeons was far higher than had been publicly reported, the net operating losses from such compensation were massive, and Broward Health had implemented a secretive scheme to over-compensate these physicians based on offsetting referral revenues closely tracked and monitored by Broward Health.

From the secretive Contribution Margin Reports, Dr. Reilly also learned that the scheme of over-compensating physicians based on referral values extended beyond the orthopedic surgeons. Dr. Reilly also obtained numerous direct private admissions of *Stark* law violations by Broward Health's senior management.

119.   The factual background demonstrates the deliberate defiance and deceit committed by Broward Health over the last 8 years as it attempted to deceive Dr. Reilly, the public, and the federal government into believing that it was complying with *Stark* laws when Broward Health knew otherwise.

## Broward Health Has Employed the Same Strategy of Recruiting, Employing, and Compensating Cardiologists Based in Part on the Value and Volume of Referral Revenues

120.   In recent years, Broward Health has aggressively recruited and hired cardiologists using a similar scheme of valuing the referral revenue stream from such physicians and determining compensation based in part on the value of anticipated referrals. Broward Health has focused on recruiting and employing cardiologists due to its fear of losing referral revenues from inpatient admissions and outpatient procedures to competing hospitals and its desire to profit from the lucrative ancillary revenues associated with inpatient cardiac admissions and outpatient cardiac procedures.

121.   For example, in Fiscal Year 2011 as of December, the secretive Broward

Health Contribution Margin Reports reveal that the overall percent of the practice overhead to collections for Broward Health's employed orthopedic surgeons was 176 percent. The overall percent of practice overhead to collections for Broward Health's employed cardiologists was 139 percent even after including "revenues" from Broward County tax dollars in the PPUC and on-call program. Without considering such tax subsidies, the overall percent of practice overhead to collections for Broward Health's employed cardiologists was 188 percent.

122.   In recruiting, employing, and excessively compensating cardiologists, Broward Health has targeted and profited from the referral revenue stream of Medicare patients who are one of the largest patient populations for cardiac care.

123.   In determining compensation for employed cardiologists, Broward Health has considered and factored profits from referral revenues. Such compensation levels and the consideration of referral profits in setting such compensation levels have resulted in major net operating losses while Broward Health has secretly tracked and monitored offsetting referral profits in a scheme of mutual enrichment.

124.   Broward Health's financial strategists have planned and budgeted for such net operating losses while they secretly tracked profits from ancillary inpatient cardiac admissions and outpatient cardiac procedures.

**Mid-Way through Fiscal Year 2011, the Overcompensation of the Employed Cardiologists Generated Net Losses of $3,444,332 Offset by Referral Profits Monitored by Broward Health**

125.   In the secretive Contribution Margin Reports mid-way through Fiscal Year 2011, Broward Health monitored the value and volume of referrals from each of its employed cardiologists (as it has done for every other Fiscal Year in question).

126.   The secretive Contribution Margin Report run by Broward Health in December 2010 reveal that the employed cardiologists generated collections of $3,904,295 mid-way through Fiscal Year 2011. Broward Health calculated the Cardiology Practice Group overhead before physician salaries to be $2,272,761. After physician salaries paid by Broward Health, Broward Health calculated the Cardiology Practice Group overhead to be $7,348,627. The percent of practice overhead to collections for the Cardiology Practice Group was 188 percent before consideration of tax subsidies for indigent care under the PPUC Program and the on-call program.

127.   Mid-way through Fiscal Year 2011, Broward Health calculated the "net loss" from the Cardiology Practice Group operations as $3,444,332.   The Cardiology Practice Group was being compensated at levels to produce net operating losses of nearly 7 million dollars for Fiscal Year 2011 before consideration of referral profits. **Even after consideration of tax subsidies, the Cardiology Practice Group was being compensated at levels to produce net**

operating losses of approximately **$4,137,656 in Fiscal Year 2011 if referral profits were not considered.**

128.  Yet Broward Health continued to secretly track hospital profits from inpatient referrals by its employed cardiologists to Broward Health hospitals in the amount of $1,587,717.  Broward Health tracked profits from outpatient referrals by its employed cardiologists to Broward Health clinics in the amount of $656,052. Broward Health tracked 208 inpatient cases and 1,065 outpatient cases referred by the Cardiology Practice Group mid-way through Fiscal Year 2011.  After determining hospital profits from referrals by employed cardiologists, Broward Health calculated a "Physician Practice & Med Ctr Contribution Compensated Care" for the Cardiology Practice Group to be a net loss of $1,200,563.  After considering the PPUC and on call tax subsidies attributed to the Cardiology Practice Group, the "Total Contribution Margin" calculated by Broward Health for the Cardiology Practice Group was a net gain of $174,941.

### In Fiscal Year 2009, Broward Health Employed the Same Scheme of Over-Compensating Employed Cardiologists to Generate Significant Losses While Broward Health Anticipated, Tracked, and Allocated Referral Profits for Each Cardiologist

129.  In Fiscal Year 2009, the secretive Contribution Margin Reports reveal that Broward Health compensated Dr. McCormack, an invasive-interventional cardiologist, at levels to generate net operating losses of $548,140 which were

offset by 290 inpatient referrals with a profit margin of $2,630,316 and 642 outpatient referrals with a profit margin of $517,839 secretly tracked by Broward Health. The "expenses" from her compensation package and overhead totaled $1,383,730. In 2009, her compensation from Broward Health was $1,020,119.20 as compared to the national 90th percentile for invasive-interventional cardiologists which was $811,697. (*See* Table 1 and Table 73A of the 2010 MGMA Physician Compensation and Production Survey Based on 2009 Data).

130.   Her collections for 2009 totaled $813,575 which was just over the national median of $777,117 according to the 2010 MGMA Physician Compensation and Production Survey based on 2009 data. Yet she was paid $208,422 in excess of the national 90th percentile while Broward Health tracked offsetting profits from referrals by Dr. McCormack to Broward Health hospitals and clinics.

131.   In Fiscal Year 2009, Broward Health compensated Dr. Chizner at levels to generate net operating losses of $750,495 which were offset by 37 inpatient referrals with a profit margin of $335,704 and 512 outpatient referrals with a profit margin of $496,628 secretly tracked by Broward Health. The "expenses" from his compensation package and overhead totaled $1,327,443. The national 90th percentile for invasive cardiologists in the United States was $712,764. (*See* Table 1 and Table 72A of the 2010 MGMA Physician Compensation and Production Survey Based on 2009 Data).

132.   His collections totaled $576,948 which was just over the national 25th percentile of $496,256 yet he was paid far in excess of the 90th percentile for invasive cardiologists in the United States.

133.   In Fiscal Year 2009, Broward Health compensated Dr. Rozanski at levels to generate net operating losses of $548,140. The "expenses" from his compensation package and overhead totaled $1,508,685. In 2009, the national 90th percentile for invasive cardiologists in the United States was $712,764. (*See* Table 1 and Table 72A of the 2010 MGMA Physician Compensation and Production Survey Based on 2009 Data). He was paid far in excess of the 90th percentile for invasive cardiologists in the United States.

134.   In Fiscal Year 2009, Broward Health compensated Dr. Sharma at levels to generate net operating losses of $701,222. The "expenses" from his compensation package, including salary and overhead, totaled $2,160,641. Dr. Sharma was paid $1,038,575.80 by Broward Health in 2009. The national 90th percentile for non-invasive cardiologists in the United States was $637,929. (*See* Table 1 and Table 74A of the 2010 MGMA Physician Compensation and Production Survey Based on 2009 Data). He was paid over $400,000 in excess of the 90th percentile for non-invasive cardiologists in the United States and such compensation generated net operating losses of $701,222 if referral profits were not considered.

135.   For his exorbitant compensation package, Broward Health secretly tracked

38 inpatient referrals with a profit margin of $142,243 and 352 outpatient referrals with a profit margin of $320,525.

136.   None of these cardiology compensation packages were commercially reasonable in the absence of referrals. All of the compensation packages were developed by Broward Health based on anticipating and tracking profits from referrals by such physicians to Broward Health hospitals and clinics.

### To Boost Physician Compensation for Referrals, Broward Health Has Paid Numerous Cardiologists under Sham "Medical Director" Contracts While Requiring Little or No Substantive Work

137.   To boost physician compensation in exchange for referrals, Broward Health has awarded "medical director" contracts to numerous employed cardiologists, including Dr. Sharma, Dr. McCormack, Dr. Chizner, Dr. Rozanski, and Dr. Perloff. Broward Health has given each of these doctors and many other doctors the title of "medical director" with purported hourly compensation under such contracts. Even though the contracts typically require the submission of time records to demonstrate hours worked, Broward Health has historically not enforced this requirement and has paid such "directors" the maximum contract amounts without documentation of hours worked and without review of the substance of such work.

138.   In private communications directly with a Broward Health "medical

director," Dr. Reilly has confirmed that the "medical director" positions awarded by Broward Health are largely sham arrangements designed to boost physician compensation with little or no substantive work required in return. One medical director does his personal exercise workout and counts such hours as his "medical director" hours. One "medical director" does not know how to read studies in the laboratory for which he is the "director." Yet another "medical director" counts hours doing procedures as "director" hours. The "directorships" are another boondoggle to boost physician compensation at Broward Health.

139.   The "medical director" contracts are one component of the compensation packages at Broward Health which contribute to the excessive payments to physicians and which are given with no little or no consideration except the offsetting referral revenues projected and monitored by Broward Health.

### For Every Employed Cardiologist, Broward Health Has Determined Compensation Based in Part on Anticipated Referrals Which Are Closely Monitored by Broward Health

140.   Broward Health's scheme of compensating cardiologists based in part on anticipated referrals has extended into 2011.

141.   For example, in 2011, Broward Health hired cardiologist Dr. David Perloff. In determining his compensation, Broward Health prepared a "Pro Forma Operating Statement" which included calculations of profits from anticipated

53

inpatient and outpatient referrals by Dr. Perloff to Broward Health hospitals and clinics.

142.   For the time period of 2004 through the present, Broward Health has regularly prepared such pro formas for determining compensation to employed physicians. Such pro formas calculate anticipated profits from referrals by each physician to Broward Health hospitals and clinics and Broward Health has commonly used such anticipated referral profits to determine physician compensation. Under this scheme, Broward Health has then subsequently tracked and monitored referral profits by each employed physician so that Broward Health could pressure such physicians if referrals were less than projected.

143.   **In 2004, Broward Health's Chief Financial Officer publicly admitted that such pro formas based in part on referral profits are "improper." Yet seven years later, Broward Health is still using such pro formas to determine physician compensation for Dr. Perloff and other employed physicians.**

144.   As in other secretive Pro Formas and Contribution Margin Reports regularly run by Broward Health, the Pro Forma for Dr. Perloff listed his "Compensated Inpatient Contribution Margin" and "Compensated Outpatient Contribution Margin" covering the time period of Fiscal Year 2012 through Fiscal Year 2014.  The Pro Forma projects and tallies "compensated cases inpatient" and "compensated cases outpatient" for each of the three years.

145.    If profits from referrals were not considered, Broward Health agreed to compensate Dr. Perloff at a level to produce net losses of $572,964 in 2012, $589,494 in 2013, and $607,340 in 2014 according to the Pro Forma. If referral profits were not considered, the net losses over 3 years would be $1,769,798.

146.   The Pro Forma for Dr. Perloff shows that Broward Health would pay him a "base salary" of $703,289 in 2012 plus $70,200 for being a "medical director." Broward Health would pay Dr. Perloff a base salary of $710,322 in 2013 plus $70,200 for being a "medical director."  And in 2014,   Broward Health would pay Dr. Perloff a base salary of $717,425 in 2013 plus $70,200 for being a "medical director."

147.    The most recent MGMA Survey is the 2011 Report based on 2010 Data. The compensation levels for Dr. Perloff are in excess of the national 90th percentile. In the 2011 MGMA Survey, the 90th percentile for non-invasive cardiologists is $700,736. (*See* Table 1 Physician Compensation from 2011 MGMA Report Based on 2010 Data). Dr. Perloff's salary is $773,489 in 2012, $780,522 in 2013, and $787,625 in 2014 according to the Pro Forma.

148.    For non-invasive cardiologists employed by hospitals, the national median salary is $459,168. (*See* Table 4 Physician Compensation from 2011 MGMA Report Based on 2010 Data).   Dr. Perloff's compensation is over $300,000 above that national median for non-invasive cardiologists employed by hospitals.

149.     Table 78A of the 2011 MGMA Report provides more specific data for non-invasive cardiologists in the Southern United States. The 90th percentile for compensation is $732,015. (*See* Table 78A Physician Compensation from 2011 MGMA Report Based on 2010 Data).  Dr. Perloff's compensation is above that 90th percentile level for the Southern United States.

150.   Also revealing is Table 78D of the 2011 MGMA Report which shows that the 90th percentile level for physician work RVUs among non-invasive cardiologists in the Southern United States is 15,670. The RVUs listed for Dr. Perloff on the Broward Health Pro Forma are only 10,948 in 2012, 11,057 in 2013, and 11,168 in 2014.  Dr. Perloff's RVU production is projected to be far below the 90th percentile and yet he will receive compensation above the 90th percentile for non-invasive cardiologists in the Southern United States.

151.   The Broward Health Pro Forma demonstrates that not only has Broward Health given Dr. Perloff a salary above the 90th percentile, but they have paid for 4.25 full-time employees dedicated to Dr. Perloff's practice at an annual cost of $244,576 in 2012, "benefits" at an annual cost of $92,986 in 2012, "fees" in the amount of $33,795, supplies in the amount of $86,848, insurance in the amount of $8,246, repairs and maintenance in the amount of $2,610, lease and rentals in the amount of $31,031, and utilities in the amount of $4,615. These overhead costs increase each year in 2013 and 2014 according to the Pro Forma.

152.   There is only one justification for the financial package Broward Health has given to Dr. Perloff: profits from referrals.

153.   Broward Health also awarded Dr. Perloff with a "medical director" position which pays $70,200 per year or $200 per hour up to 351 hours per year.   Like numerous medical director positions at Broward Health, such titles and money are given to boost physician compensation while requiring minimal or no substantive work to perform the duties of a medical director. Such is the case with Dr. Perloff.

### Broward Health Has Knowingly Paid Orthopedic Surgeons and Cardiologists Based on Inflated RVUs

154.   As discussed above, at the origin of physician employment contracts, Broward Health has commonly calculated anticipated profits from referrals and then used such referral profits in determining the physician compensation package. For physicians with high numbers of referrals, Broward Health has permitted such physicians to inflate their RVU[8] numbers to increase their compensation.   Such a

---

[8]   RVU is an acronym that stands for "relative value unit." An RVU is an estimate of the time and resources required of a physician for each encounter, procedure, or surgery.  The value is standardized, but the way the value is used in the compensation formula may vary from employer to employer.  The MGMA tracks RVU values for various physician specialties. These values are included in the annual physician compensation report published by the MGMA.  Some physician employers such as hospitals and groups use an RVU formula to calculate compensation or bonuses for physicians.  This is generally accomplished by the use of a "conversion factor," which is a dollar amount per RVU which is used as a multiplier to determine the value of or compensation for a procedure.

scheme allows Broward Health to give the appearance of paying physicians based on RVU production. In reality, Broward Health has knowingly entered into numerous physician employment contracts based in part on excessive compensation rates per RVU and then knowingly permitted certain physicians to escalate their compensation even higher with inflated numbers of RVUs while Broward Health has tracked and monitored offsetting referral profits.

155.   At private meetings in the fall of 2011, Brian Ulery, the former Vice-President of Physician Services at Broward Health, admitted that Broward Health's executives were aware of certain employed orthopedic surgeons and employed cardiologists "unbundling" their procedures to generate higher RVUs and higher compensation. Broward Health's senior executives permitted this practice in a *quid pro quo* for referral revenues generated by such physicians.

156.   In private communications, Broward Health's Chief Executive Officer, Frank Nask, has admitted that the RVUs for employed orthopedic surgeons at Broward Health have been inflated throughout their employment because Broward Health has failed to apply the multiple procedure reduction rule in calculating RVUs for outpatient and inpatient orthopedic services and procedures.

157.   The MGMA Physician Compensation and Production Surveys use modifier adjusted RVUs for reporting purposes. Column 27 of Appendix F to the

2011 MGMA Report is the 2011 Guide to the Questionnaire Based on 2010 Data provides instructions for Physician work RVUs. "Physician work RVUs include…RVUs for the 'physician work RVUs' only **including any adjustments made as a result of modifier usage.**" (Emphasis added). Earlier MGMA Reports from prior years provided the same instruction to apply modifiers in calculating or adjusting physician work RVUs.

158. Contrary to the MGMA method of calculating physician work RVUs, Broward Health's system of tracking and calculating RVUs for employed physicians has not applied modifier adjustments. Consequently, the RVUs of employed physicians, especially surgeons, have been inflated.

159. When two or more medical procedures are performed during the same session by the same provider, commercial insurers and the Medicare Program do not permit payment for all procedures at the full billed or fee schedule amounts. For example, under the multiple procedure reduction rule, Medicare will allow 100 percent of the fee schedule amount (or billed amount if it is less) for the first procedure reported, and 50 percent for the second, third, fourth, and fifth procedures. When more than five procedures are performed in the same session, an operative report must be submitted and the Medicare carrier determines if any additional payment is allowed.

160. Regulations regarding Medicare payments for multiple surgical procedures

performed in an Ambulatory Surgical Center are contained in 42 C.F.R. § 416.120. When one covered surgical procedure is furnished to a beneficiary in an operative session, payment is based on the prospectively determined rate for that procedure. When more than one surgical procedure is furnished in a single operative session, payment is based on the full rate for the procedure with the highest prospectively determined rate and one half of the prospectively determined rate for each of the other procedures.

161.   Section 4826 of the Medicare Claims Review and Adjudication Procedures and the Medicare Claims Processing Manual contain similar instructions and requirements for billing multiple procedures. *See* Medicare Claims Processing Manual, Chapter 12, Transmittal 40.6.

162.   In processing physician RVUs, Broward Health has deliberately failed to apply the multiple procedure reduction rule and has deliberately enriched employed surgeons performing multiple procedures with inflated RVU numbers. Such failure and inflated RVUs for employed surgeons have contributed to the excessive compensation paid to such employed physicians in violation of Federal *Stark* Laws discussed above.

163.   Broward Health's executive management has been on notice of multiple alarms evidencing inflated RVU numbers associated with certain orthopedic surgeons and cardiologists.

164.   For example, Broward Health has long been aware of cardiologist Dr. McCormack's inflated RVU numbers. In January of 2008, an internal analysis of Dr. McCormack's practice determined that her work RVUs were "reported as 4.3 times expected value (21,731 vs. 5,020)." **Her "total assessed time (RUC) is 4.5 times FMV (9,004 vs. 2,000 hours)."** "Chi-square test indicates significant difference between expected and performed procedures in rank order."

165.   Dr. McCormack was billing RVUs at a level to correspond with 9,000 hours of service per year. There are only 8,736 hours in a year. **Her estimated work time based on her submitted RVUs exceeds the entire number of hours in a year.**

166.   The "Preliminary Concerns" from this internal Analysis are "[p]otential of reporting for procedures that are not done," [u]sing improper or incorrect CPT codes to report non-E/M procedures," "[u]nbundling of CCI and other bundled edits," and "[r]eporting global codes for professional services." *Id.*

167.   Despite these "concerns," Broward Health has continued to pay Dr. McCormack compensation far in excess of the 90th percentile for invasive-interventional cardiologists in the United States.

168.   Further, subsequent internal evaluation by Broward Health of Dr. McCormack's practice also revealed that her RVUs were inflated by RVU credits

for the unsupervised work of multiple physician assistants and nurse practitioners.[9]

169.   Despite such findings, Dr. McCormack's implausible RVUs have continued. Dr. McCormack produced 3,672 RVUs for the two month period of July-August 2009. Her "planned budget" RVUs are even higher at 4,027 for a two-month period or 24,162 RVUs for the fiscal year.

170.   Such numbers are implausible for an invasive-interventional cardiologist such as Dr. McCormack who also ostensibly serves as a "medical director" with required administrative duties each week. The 2010 MGMA national median level of RVUs for hospital-employed invasive-interventional cardiologists was only

---

[9]   A physician can bill for the services of a nurse practitioner (NP) or physician assistant (PA) if the services of such NP or PA are billed incident to the physician's services; however to do so, the physician must meet certain supervision requirements. The services must be performed under the <u>direct personal supervision of the physician</u> as an integral part of the physician's personal in-office service. Such direct personal supervision requires that the physician initiate the course of treatment for which the service being performed by the NP or PA is an incidental part and that the physician remain actively involved with the patient's care. *The physician must also be physically present in the same office suite and be immediately available to render assistance if necessary.* In addition, the NP or PA must be employed by the physician (or be a leased employee). Services provided by auxiliary personnel not in the employ of the physician, even if included in the physician's bill, are not covered as incident to a physician's service. The advantage of billing "incident to" is the practice receives 100% of the physician fee schedule for the service. The disadvantage is all of the incident to requirements must be followed. If a NP or PA bills directly for his or her services under their own Medicare provider ID number, the NP or PA receives 85% of the physician fee schedule. The advantage is that the restrictive "incident to" rules do not apply for NPs or PAs billing directly under their own number. Incident to billing is not permitted in hospitals, skilled nursing facilities or in the home.

10,685. (*See* Table 60 of MGMA Physician Compensation and Production Survey, 2010 Report Based on 2009 Data).   Broward Health budgeted for Dr. McCormack's RVUs to exceed the national median by 226 percent.

171.   The 2010 MGMA Survey indicates that the highest percentile (90th percentile) of all invasive-interventional cardiologists in the United States produced 18,316 RVUs. (*See* Table 58 of MGMA Physician Compensation and Production Survey, 2010 Report Based on 2009 Data).

172.   Broward Health budgeted her RVU numbers at a pace to exceed the RVU levels of the highest percentile (90th percentile) of invasive-interventional cardiologists in the United States by approximately 6,000 RVUs.

173.   Another example of implausible RVUs concerns the RVUs reported and budgeted for invasive cardiologist, Dr. Rozanski.   For Fiscal Year 2009, Broward Health's budgeted annual RVUs for Dr. Rozanski were 22,500.   The 2010 MGMA Survey indicates that the highest percentile (90th percentile) of invasive cardiologists in the United States produced 14,528 RVUs. (*See* Table 58 of MGMA Physician Compensation and Production Survey, 2010 Report Based on 2009 Data).

174.   The budgeted RVUs for Dr. Rozanski were at a pace to exceed the 90th percentile by 8,000 RVUs. Dr. Rozanski also serves as a "medical director" with ostensibly required administrative duties each week.

175.   The 2010 MGMA national median level of RVUs for hospital-employed invasive cardiologists was only 9,685. (*See* Table 60 of MGMA Physician Compensation and Production Survey, 2010 Report Based on 2009 Data). The budgeted RVU numbers for Dr. Rozanski (22,500) were more than double that national median (9,685).

176.   The reported RVUs for other cardiologists at Broward Health are also implausible. In Fiscal Year 2010, the budgeted RVUs for Dr. Ashok Sharma, a non-invasive cardiologist, were 25,008. Dr. Sharma also serves as a "medical director" with ostensibly required administrative duties each week.

177.   The 2010 MGMA national median physician works RVUs for hospital employed non-invasive cardiologists was only 7,665. (*See* Table 60 to 2010 MGMA Physician Compensation and Production Survey). The budgeted RVUs for Dr. Sharma were over 3 times the national median for hospital-employed non-invasive cardiologists in 2009.

178.   The budgeted RVUs for Dr. Sharma were approximately double the national 90th percentile for all non-invasive cardiologists which were only 12,450 RVUs. (*See* Table 58 to 2010 MGMA Physician Compensation and Production Survey).

**Broward Health's Excessive Physician Compensation Based in
Part on the Volume and Value of Referrals Has Spanned All
Practice Areas and Continued into Fiscal Year 2011**

179.   The secretive Broward Health Contribution Margin Reports evidence a strategic scheme to compensate physicians based in part on the value of referral profits. That scheme is not limited to orthopedic surgeons and cardiologists. Their scheme to boost hospital admissions has spanned every practice group of physicians recruited, employed, and compensated by Broward Health.

180.   Broward Health's secretive Contribution Margin Reports for Fiscal Year 2011 Year-to-Date as of December 2010 tracked referral profits from all of its employed physician practice groups and every individual physician. These physician practice Contribution Margin Reports covered the first half of Fiscal Year 2011 which began on July 1, 2010.

181.   Broward Health's financial strategists have regularly run such secretive Contribution Margin Reports throughout the fiscal year as they have tracked and monitored the value and volume of referrals from such physicians to Broward Health hospitals and clinics.  If referral revenues did not offset compensation for a particular employed physician or if referrals were less than projected, Broward Health's financial strategists commonly increased pressure on that physician for more referrals.

182.   Broward Health's secretive Contribution Margin Reports mid-way through

Fiscal Year 2011 revealed that its employed physicians continued to be compensated at levels which generated major net operating losses (if profits from referrals by such physicians to Broward Health hospitals are not considered). The physician compensation amounts were financially sustainable for Broward Health only by their conduct in calculating and tracking referrals from employed physicians and were not commercially reasonable in the absence of those referrals.

183.   Mid-way through Fiscal Year 2011, Broward Health calculated the year-to-date "net losses from operations" for its employed physicians to be $10,501,373.

184.   Practice overhead (which primarily represented physician compensation)[10] for all practice groups totaled $25,047,758, yet total collections for all practice groups totaled only $14,546,385. The overall percent of practice overhead to collections was 172 percent without consideration of tax dollar subsidies under the PPUC and on-call programs and 152 percent even with such tax dollar subsidies. Such percentages would be economically unviable if the parties were not in a position to generate and receive referral profits as identified below.

185.   The compensation to collections ratios for employed physicians were not sustainable for any hospital, for profit or non-profit, unless there was an alternative economic justification for such ratios which would offset the massive losses.

---

[10]   Practice overhead includes physician salaries, physician bonuses, physician benefits, supplies, insurance, repairs and maintenance, lease and rentals, utilities, and employee salaries.

186. The extensive secretive Contribution Margin Reports and analyses of physician "contribution margins," the Pro Formas with projected contribution margins used for recruiting and determining compensation for employed physicians, and the private admissions of Broward Health executives all point to one economic justification for the excessive compensation to collections ratios: profits from referrals by such physicians to Broward Health hospitals and clinics.

## Mid-Way through Fiscal Year 2011, Profits From Referrals by Employed Physicians to Broward Health Hospitals and Clinics Changed the Net Operating Losses of Approximately 10.5 Million Dollars into Net Profits of Approximately 5.9 Million Dollars

187. Throughout Fiscal Year 2011 and every other year in question, Broward Health has systematically and secretly monitored and evaluated referral profits or the so-called inpatient and outpatient "contribution margins" from its employed physicians.

188. Mid-way through Fiscal Year 2011, referral profits or "contribution margins" changed the net operating losses of $10,501,373 caused by Broward Health's overcompensation of employed physicians into a net gain of $5,929,288 for Broward Health plus $1,878,166 in tax subsidies for indigent care compensation under the PPUC Program. From all physician groups, Broward Health tracked 2,114 inpatient referrals with profits of $7,790,545 and 13,192 outpatient referrals with profits of $8,640,116.

189.   The "contribution margins" secretly tracked by Broward Health's financial strategists in Fiscal Year 2011 and every other year at issue represent hospital profits from referrals by employed physicians to Broward Health hospitals and clinics.   Under "Contribution Compensated Care" for each employed physician, Broward Health has calculated the "inpatient contribution margin," the "outpatient contribution margin," "cases inpatient," and "cases outpatient."

### Mid-way through Fiscal Year 2011, the Overcompensation of the Primary Care Practice Group Generated Net Losses of $1,158,845 Offset by Referral Profits of Approximately 4.3 Million Dollars Monitored by Broward Health

190.   On its secretive Contribution Margin Reports, Broward Health divides its employed physicians into five practice groups: primary care, cardiology, hematology/oncology, orthopedics, and other.

191.   In the secretive Contribution Margin Reports mid-way through Fiscal Year 2011, Broward Health monitored the value and volume of referrals from every practice group in addition to the Orthopedic and Cardiology Practice Groups discussed above. The Primary Care Physician Practice Group generated collections of $3,094,089. The Primary Care Practice overhead before physician salaries was $2,343,219. After physician salaries and bonuses paid by Broward Health, the Primary Care Practice overhead was $4,252,934. For the Primary Care Physician Group, the percent of practice overhead to collections was 137 percent.

192.   With respect to the Primary Care Practice Group, Broward Health calculated

the "net loss from operations" to be $1,158,845 mid-way through Fiscal Year 2011. Yet Broward Health also tracked hospital profits from inpatient and outpatient referrals by its employed primary care physicians to Broward Health hospitals and clinics. Such referral profits totaled $4,395,315. Broward Health tracked 788 inpatient cases referred by the Primary Care Practice Group and 4,301 outpatient cases.

193.   Broward Health therefore calculated a "Physician Practice & Med Ctr Contribution Compensated Care" for the Primary Care Group to be a profit of $3,236,470.  After considering the PPUC and on call benefit payments attributed to the Primary Care Practice Group, the "Total Contribution Margin" calculated by Broward Health for the Primary Care Practice Group was a net gain of $3,247,720.

194.   The "inpatient contribution margin" or profits from inpatient referrals by employed primary care physicians were $3,279,365, which is the highest inpatient profits associated with referrals from any practice specialty at Broward Health. That fact further explains Broward Health's current focus on recruiting and compensating primary care physicians who have brought the highest inpatient referral profits to Broward Health hospitals as discussed below.

### Mid-way through Fiscal Year 2011, the Overcompensation of the Hematology/Oncology Group Generated Net Losses of $1,346,002 Offset by Approximately 4.7 Million Dollars in Referral Profits Monitored by Broward Health

195.   In the secretive Contribution Margin Reports mid-way through Fiscal Year 2011, Broward Health also monitored the value and volume of referrals from the employed Hematology/Oncology Practice Group.

196.   Mid-way through Fiscal Year 2011, the Contribution Margin Reports revealed that Broward Health determined the Hematology/Oncology Group generated collections of $811,322.   Broward Health calculated the practice overhead before physician salaries as $694,235.   After physician salaries paid by Broward Health, the Hematology/Oncology Practice overhead was $2,157,324. The percent of practice overhead/collections for the Hematology/Oncology Group was 265 percent.

197.   Broward Health calculated the "net loss" from the Hematology/Oncology Practice operations as $1,346,002.   Yet Broward Health secretly tracked hospital profits from inpatient referrals by its employed hematologists and oncologists in the amount of $1,125,583.   Broward Health also tracked hospital profits from outpatient referrals by its employed hematologists and oncologists in the amount of $3,666,252.   Broward Health tracked 502 inpatient cases referred by the Hematology/Oncology Group and 3,339 outpatient cases.   Broward Health

therefore calculated a "Physician Practice & Med Ctr Contribution Compensated Care" for the Hematology/Oncology Group to be a net gain of $3,445,833. After considering the PPUC and on call benefit payments attributed to the Hematology/Oncology Practice Group, the "Total Contribution Margin" calculated by Broward Health for that Practice Group was a net gain of $3,598,358.

**Mid-way through Fiscal Year 2011, the Overcompensation of the "Other" Category of Employed Physicians Generated Net Operating Losses of $2,069,748 Offset by Approximately 1.3 Million Dollars in Referral Profits Monitored by Broward Health**

198.   In the "Other" category of employed physicians for Fiscal Year 2011 as of December, the secretive Contribution Margin Reports reveal that Broward Health calculated the collections for that practice group of employed physicians totaled $3,506,885, yet practice overhead (which primarily represents physician salaries) totaled $5,576,634. The percent of practice overhead/collections was 159 percent, causing a net operating loss of $2,069,748 associated with the "Other" group of employed physicians.

199.   Yet Broward Health tracked hospital profits from inpatient referrals by its "other" category of employed physicians to Broward Health hospitals in the amount of $456,600. Broward Health tracked profits from outpatient referrals by its "other" category of employed physicians to Broward Health clinics in the amount of $883,503. Broward Health tracked 281 inpatient cases and 2,051

outpatient cases referred by the "Other" Practice Group.

200.   Broward Health's secret Contribution Margin Reports for Fiscal Year 2011 reveal that Broward Health has continued to overpay its employed physicians across all practice groups under a scheme in which Broward Health has anticipated, tracked, monitored, and targeted profits from inpatient and outpatient referrals from such employed physicians to Broward Health hospitals and clinics in violation of Federal *Stark* laws.

201.   Across all physician practice groups, Broward Health has paid practice overhead (primarily physician compensation) which significantly exceeded collections from the services of such physicians.   If referral profits were not considered or if the physicians were not in a position to refer patients to Broward Health hospitals, Broward Health has repeatedly and deliberately entered into employment arrangements with physicians across all practice groups on financial terms which cause multi-million dollar losses each year.   Broward Health deliberately chose to enter and continue such arrangements because it secretly anticipated, tracked, and pushed its physicians for offsetting referral revenues.

**Throughout the Broward Health System, Broward Health Has Implemented a Scheme to Compensate Employed Physicians Based In Part on the Value and Volume of Inpatient and Outpatient Referrals**

202.   Broward Health's scheme to over-compensate physicians for referrals has spanned the years 2004 through the present.

203.   For example, Broward Health's secretive Contribution Margin Reports for Fiscal Year 2009 reveal that at every hospital within the Broward Health system, the physician practice groups operated at significant net losses which were offset by referral profits monitored by Broward Health. At the end of Fiscal Year 2009, the year-to-date net loss from the employed physician practice groups was $17,479,732. "Expenses" associated with the physician practice groups totaled $36,113,387, while net operating revenue totaled only $18,633,655.

204.   Broward Health secretly factored the inpatient and outpatient "contribution margins" or referral profits from such physicians which changed the net losses of $17,479,732 into net gains of $11,433,330.[11]

205.   The profits from referrals by employed physicians represented a swing of approximately 28 million dollars.  The physicians were compensated at levels far in excess of the value of their personal services while the hospital system received millions of dollars in referral profits to offset the losses generated by physician compensation.

206.   Throughout the years 2004-2011, Broward Health regularly ran secretive "Physician Practice Contribution Margin" Reports for each hospital within the

---

[11] Broward Health then reduced the net profits by $1,715,240 which represented 25 percent of uncompensated care direct costs not reimbursed by the allocated tax revenue. The adjusted total contribution margin after considering profits from physician referrals to Broward Health hospitals and clinics was $9,718,090 as of June for Fiscal Year 2009.

Broward Health system during each fiscal year and at the end of each fiscal year. In the "Physician Practice Contribution Margin" Reports, Broward Health systematically and secretly tracked the volume and value of inpatient and outpatient referrals from employed physicians to each Broward Health hospital and clinic.

207.   Broward Health's Contribution Margin Reports reveal that at every hospital within the Broward Health system, the physician practice groups are deliberately being paid at levels which produce significant net operating losses offset by inpatient and outpatient referral revenues tracked by Broward Health.

## Broward General Medical Center

208.   As of June at the end of the 2009 Fiscal Year, at Broward General Medical Center ("Broward General"), the Contribution Margin Reports reveal that the employed physician practice groups had produced operating revenue of approximately $13,249,062, yet "expenses" from their practices (which primarily represented physician compensation) equaled approximately $23,688,887. According to Broward Health's own calculations on the Contribution Margin Reports, the physician compensation produced a "net loss from operations" in the amount of approximately $10,439,825 at Broward General for Fiscal Year 2009.

209.   Despite this major operating loss from the physician practice groups at Broward General, Broward Health tracked the "Contribution Compensated Care"

from the physician practice groups which consisted of four factors: (1) the "inpatient contribution margin," (2) "outpatient contribution margin," (3) "cases inpatient," and (4) "cases outpatient." These factors represented the value and volume of referrals from employed physicians to that hospital. The "cases" represent the numerical volume of patients referred by each practice group. The "contribution margin" numbers represented profits from physician referrals to Broward Health.

210.   For Fiscal Year 2009, Broward Health calculated the "Inpatient Contribution Margin" for employed physician practice groups at Broward General was $8,530,535 and the "Outpatient Contribution Margin" for employed physician practice groups at Broward General was $12,571,211. Broward Health tracked the "Cases Inpatient" from employed physician practice groups at Broward General as 2,186 and the "Cases Outpatient" as 13,266 for Fiscal Year 2009.

211.   The profits from referrals by employed physicians at Broward General turned the net operating loss of $10,439,825 into a profit of $10,661,921 according to Broward Health's secretive "contribution margin reports" for Fiscal Year 2009. Profits from physician referrals represented an approximate 20 million dollar swing from net losses to net gains at Broward General.

## North Broward Medical Center

212.   As of June at the end of the 2009 Fiscal Year, at North Broward Medical

Center, the employed physicians had generated operating revenue of $1,141,019, yet "expenses" from their practices (which primarily represented physician compensation) equaled $2,634,114. The physician compensation produced a "net loss from operations" in the amount of $1,493,095 at North Broward Medical Center.

213.   Despite this operating loss from the physician practice groups at North Broward Medical Center, Broward Health again secretly tracked the "Contribution Compensated Care" which consisted of four factors: (1) the "inpatient contribution margin," (2) "outpatient contribution margin," (3) "cases inpatient," and (4) "cases outpatient."

214.   Broward Health calculated the "Inpatient Contribution Margin" for employed physician practice groups at North Broward Medical Center was $1,200,134 and the "Outpatient Contribution Margin" for employed physician practice groups at North Broward Medical Center was $121,823. Broward Health tracked the "cases inpatient" from employed physician practice groups at North Broward Medical Center as 371 and the "Cases Outpatient" as 597 for Fiscal Year 2009.

## Imperial Point Medical Center

215.   As of June at the end of the 2009 Fiscal Year, at Imperial Point Medical Center, the employed physicians had produced operating revenue of $2,539,591,

yet "expenses" from their practices (which primarily represented physician compensation) equaled $5,089,832. According to Broward Health's secretive Contribution Margin Reports, the physician compensation produced a "net loss from operations" in the amount of $2,550,241 at Imperial Point Medical Center for Fiscal Year 2009.

216.   Despite this operating loss, Broward Health again secretly tracked the "Contribution Compensated Care" from the physician practice groups which consisted of the same four variables: (1) the "inpatient contribution margin," (2) "outpatient contribution margin," (3) "cases inpatient," and (4) "cases outpatient."

217.   Broward Health calculated the "Inpatient Contribution Margin" for employed physician practice groups at Imperial Point Medical Center was $1,624,836 and the "Outpatient Contribution Margin" for employed physician practice groups at Imperial Point was $2,818,230. Broward Health tracked the "cases inpatient" from employed physician practice groups at Imperial Point as 576 and the "Cases Outpatient" as 8,526 for Fiscal Year 2009.

218.   By tracking the value of profits from referrals by employed physicians to Imperial Point Medical Center, the net operating loss of 2.5 million dollars caused by excessive physician compensation became a 1.8 million dollar gain to Broward Health in that Fiscal Year.

**For Fiscal Year 2009, Broward Health Deliberately Paid Excessive Physician
Compensation to Generate Net Operating Losses of Approximately
$17,479,732 Offset by Approximately 28 Million Dollars in Referral Profits**

219.   At the end of Fiscal Year 2009, across the Broward Health system, the net
losses from employed physician practice groups were approximately $17,479,732
according to Broward Health's secretive Contribution Margin Reports. Excessive
physician compensation was the primary factor which caused this significant net
operating loss while Broward Health secretly projected and monitored the inpatient
and outpatient "contribution margins" or profits from referrals by its employed
physicians.

220.   In Fiscal Year 2009, such "contribution margins" from physician referrals
transformed the net losses of approximately $17,479,732 generated by the
physician practice groups into profits of approximately $11,433,330 for Broward
Health. Profits from referrals by employed physicians represented an approximate
28 million dollar swing to Broward Health.

221.   The following examples illustrate the massive referral profits originating
from employed physicians being compensated at levels to generate significant
operating losses (if referral profits were not considered).

222.   In Fiscal Year 2009, Broward Health compensated Dr. Rodriguez-Cortes at
levels to generate net operating losses of $338,689 which were offset by 401

inpatient referrals with a profit margin of $1,282,146 and 1,226 outpatient referrals with a profit margin of $420,301 secretly tracked by Broward Health.

223.   In Fiscal Year 2009, Broward Health compensated Dr. Roskos at levels to generate net operating losses of $275,835 which were offset by 423 inpatient referrals with a profit margin of $711,463 and 1,826 outpatient referrals with a profit margin of $387,412 secretly tracked by Broward Health.

224.   In Fiscal Year 2009, Broward Health compensated Dr. Chizner at levels to generate net operating losses of $750,495 which were offset by 37 inpatient referrals with a profit margin of $335,704 and 512 outpatient referrals with a profit margin of $496,628 secretly tracked by Broward Health.

225.   In Fiscal Year 2009, Broward Health compensated Dr. Caldwell at levels to generate net operating losses of $814,007 which were offset by 2 inpatient referrals with a profit margin of $7,231 and 715 outpatient referrals with a profit margin of $857,295 secretly tracked by Broward Health.

226.   In Fiscal Year 2009, Broward Health compensated Dr. Yoldas at levels to generate net operating losses of $791,630 which were offset by 32 inpatient referrals with a profit margin of $113,705 and 1,412 outpatient referrals with a profit margin of $1,555,034 secretly tracked by Broward Health.

227.   In Fiscal Year 2009, Broward Health compensated Dr. Kanell at levels to generate net operating losses of $577,794 which were offset by 509 outpatient

referrals with a profit margin of $716,089 secretly tracked by Broward Health.

228.   In Fiscal Year 2009, Broward Health compensated Dr. Wiznitzer at levels to generate net operating losses of $594,659 which were offset by 55 inpatient referrals with a profit margin of $207,816 and 1,608 outpatient referrals with a profit margin of $4,251,262 secretly tracked by Broward Health.

229.   In Fiscal Year 2009, Broward Health compensated Dr. Maini at levels to generate net operating losses of $696,019 which were offset by 28 inpatient referrals with a profit margin of $68,479 and 807 outpatient referrals with a profit margin of $1,325,550 secretly tracked by Broward Health.

230.   In Fiscal Year 2009, Broward Health compensated Dr. Powell at levels to generate net operating losses of $367,760 which were offset by 61 inpatient referrals with a profit margin of $586,445 and 84 outpatient referrals with a profit margin of $11,391 secretly tracked by Broward Health.

231.   In Fiscal Year 2009, Broward Health compensated Dr. Stoll at levels to generate net operating losses of $378,863 which were offset by 107 inpatient referrals with a profit margin of $503,526 and 206 outpatient referrals with a profit margin of $79,533 secretly tracked by Broward Health.

232.   In Fiscal Year 2009, Broward Health compensated Dr. Burke at levels to generate net operating losses of $415,851 which were offset by 314 inpatient referrals with a profit margin of $871,853 secretly tracked by Broward Health.

233.   In Fiscal Year 2009, Broward Health compensated Dr. Zafar at levels to generate net operating losses of $463,468 which were offset by 60 inpatient referrals with a profit margin of $363,671 and 447 outpatient referrals with a profit margin of $923,616 secretly tracked by Broward Health.

234.   In Fiscal Year 2009, Broward Health compensated Dr. McCormack at levels to generate net operating losses of $548,140 which were offset by 290 inpatient referrals with a profit margin of $2,630,316 and 642 outpatient referrals with a profit margin of $517,839 secretly tracked by Broward Health.

235.   In a strategy which violates Federal *Stark* and Anti-kickback Laws, Broward Health has agreed to pay its employed physicians at excessive levels in anticipation of projected referral profits. Broward Health has executed such strategy by closely monitoring profits from actual inpatient and outpatient referrals from such employed physicians to Broward Health hospitals and clinics for every year between 2004 and the present.

236.   By their own internal calculations, it was mathematically impossible for Broward Health to break even under such compensation arrangements with employed physicians. Broward Health repeatedly planned and budgeted major net operating losses from physician compensation packages while it secretly tracked offsetting profits from referrals by such physicians for ancillary services at Broward Health hospitals and clinics. If the physicians were not in a position to

refer patients to Broward Health hospitals and clinics, the compensation arrangements would be economically unfeasible for Broward Health.

### Broward Health's Current Focus on Recruiting, Employing, and Compensating Primary Care Physicians with the Highest Referrals to Broward Health Hospitals

237.   In the spring of 2011, the financial strategists at Broward Health secretly ran extensive reports to identify the non-employed primary care physicians who have generated the most referrals to Broward Health hospitals. The Broward Health financial strategists performed extensive calculations of the profits to Broward Health hospitals from such referrals and they implemented a strategy to recruit, employ, and compensate such physicians based on their high value and volume of referrals.

238.   At a private meeting with other executives and NBHD Commissioners, the former Vice-President of Physician Services, Brian Ulery, passed out detailed reports which listed the top referring physicians with the values and volumes of referrals associated with each physician.   Mr. Ulery refused to allow anyone to retain a copy of such reports, he numbered each copy, and Joseph Rogers, Broward Health's former Chief Operating Officer, insisted on collecting and counting every copy after Mr. Ulery's presentation.

239.   In his presentation, Mr. Ulery said,

So how do we protect our compensated base?

We are targeting those physicians who represent about 80 percent of our compensated base.

Our current list of physicians in our hospital is relatively small compared to some of the HCA hospitals...in only takes 21 doctors at North Broward to make 80 percent of their compensated admissions, 47 at Broward General, 25 at Imperial Point...and 20 doctors at Coral Springs.
You can imagine if any doctor on this list if they get poached or taken away by HCA or anyone else has significant impact on our bottom line...

240.   Although Mr. Ulery and Mr. Rogers both resigned from Broward Health in the months after learning of this federal investigation, Broward Health's remaining financial strategists have continued to pursue the strategy presented by Mr. Ulery which is to recruit, employ, and compensate the primary care physicians who represented approximately 80 percent of the Broward Health compensation base from inpatient admissions as revealed in secretive "Contribution Margin Reports." Broward Health has used and will use such referral profits as factors in determining compensation to such physicians.

## The Massive Losses from Physician Practice Groups Are Not Justified by Such Physicians' Charity Care

241.   The massive losses from physician practice groups at Broward Health are not justified by such physicians' charity care.

242.   The overall charity care numbers for employed physicians are extremely low. For example, in the year-end secretive Physician Practice Contribution Margin Report for Fiscal Year 2009, there are 25 employed physicians practicing out of Broward General, the largest of the Broward Health hospitals. These physicians produced total revenue from compensated care just over 13 million dollars for Fiscal Year 2009. The listed "charity" care for all 25 physicians totals a miniscule $88.00 or .000006 of generated revenues for physician services.

243.   According to another secretive Physician Practice Contribution Margin Report for Fiscal Year 2009, for all employed physician practice groups at all Broward Health hospitals, charity care totaled only $15,314 for Fiscal Year 2009. This miniscule amount of charity care represented .0008 percent of the compensated revenues generated from the employed physicians' services for Fiscal Year 2009 ($18,633,655).

244.   Broward Health's "charitable" mission does not justify the illegal conduct at issue.   The physicians who are being excessively compensated are not in short supply in the Broward County market.   Broward Health is not attempting to meet an unmet community need.   Rather Broward Health has implemented the compensation scheme described in detail above to increase market share of hospital admissions and revenues.   The specialists that Broward Health has chosen to subsidize with excessive compensation are all well represented in the

community and are lucrative sources of referral profits.

## Federal Healthcare Programs

### Introduction to the Medicare Program

245.   Federal Healthcare Programs include patients covered under the Medicare, Medicaid, and Tri-Care Programs discussed below in addition to federal employees and retired federal employees.

246.   Since 2004, Broward Health has received in excess of 1 billion dollars in revenues from the Medicare Program.   A significant portion of such revenues received by Broward Health from the Medicare Program derived from inpatient and outpatient referrals by employed physicians receiving excessive compensation as described above.

247.   Between 2004 and the present, Broward Health has submitted thousands of claims both for specific services provided to Medicare beneficiaries and claims for general and administrative costs incurred in treating Medicare beneficiaries.

248.   In 1965, Congress enacted Title XVIII of the Social Security Act (Medicare) to pay for the cost of certain medical services for persons aged 65 years or older and those with disabilities.

249.   The Medicare Program is divided into four parts. Medicare Part A authorizes

payment for institutional care, including hospital, skilled, nursing facility, and home health care. *See* 42 U.S.C. §§ 1395c-1395i-4. Part B of the Medicare Program authorizes payment for outpatient health care expenses, including physician fees. *See* 42 U.S.C. §§ 1395-1395w-4.

250.  HHS is responsible for the administration and supervision of the Medicare Program. CMS is an agency of HHS and is directly responsible for the administration of the Medicare Program.

251.  Under the Medicare Program, CMS makes payments retrospectively to hospitals for inpatient services. Medicare enters into provider agreements with hospitals to establish the hospitals' eligibility to participate in the Medicare Program. Medicare does not prospectively contract with hospitals to provide particular services for particular patients. Any benefits derived from those services are derived solely by the patients and not by Medicare or the United States.

252.  Broward Health has executed at least one provider agreement with CMS in which it agreed to abide by the Medicare laws, regulations and program instructions..." CMS Provider/Supplier Enrollment Application, Forms 855-A and 855-B. Broward Health expressly certified its understanding "that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulation and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law)..." *Id.*

253.    To assist in the administration of Medicare Part A, CMS contracts with "fiscal intermediaries." 42 U.S.C. § 1395h. Fiscal intermediaries, typically insurance companies, are responsible for processing and paying claims and auditing cost reports.

254.    Hospitals submit claims for interim reimbursement for items and services delivered to Medicare beneficiaries during their hospital stays. 42 C.F.R. §§ 413.1, 413.60, 413.64. Hospitals submit patient-specific claims for interim payments on a Form UB-92.

255.    As a condition of payment by Medicare, CMS requires hospitals to submit annually a Form CMS-2552, more commonly known as the hospital cost report. A cost report is the final claim that a provider submits to the fiscal intermediary for items and services rendered to Medicare beneficiaries. As discussed above and below, each cost report contains mandatory certifications of compliance with *Stark* and Anti-Kickback Laws.

256.    After the end of each hospital's fiscal year, the hospital files its cost report with the fiscal intermediary, stating the amount of reimbursement the provider believes it is due for the year. *See* 42 U.S.C. § 13959g); 42 C.F.R. § 413.20. Medicare relies upon the cost report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare. 42 C.F.R.

§§ 405.1803, 413.60 and 413.64(f) (1).

257.   The Broward Health Defendants were required to submit cost reports to their fiscal intermediary for each Fiscal Year between 2004 and the present.

258.   Medicare payments for inpatient hospital services are determined by the claims submitted by the provider for particular patient discharges (specifically listed on UB-92 Forms or UB-04 Forms after March of 2007) during the course of the fiscal year. On the cost report, this Medicare liability for services is then totaled with any other Medicare liabilities to the provider. This total determines Medicare's true liability for services rendered to Medicare beneficiaries during the course of a fiscal year. From this sum, the payments made to the provider are subtracted to determine the amount due Medicare or the amount due the provider.

259.   At all times relevant to this Third Amended Complaint, the Medicare Program, through its fiscal intermediaries, had the right to audit the cost reports and financial representations made by Broward Health to ensure their accuracy and protect the integrity of the Medicare Program. This includes the right to adjust cost reports previously submitted by a provider if any overpayments have been made. 42 C.F.R. § 413.64(f).

260.   Each hospital cost report contains a "Certification" that must be signed by the chief administrator of the hospital provider or a responsible designee of the administrator.

261.   For each of the Fiscal Years between 2004 and the present, each cost report certification page submitted by Broward Health included the following notice: "Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil, and administrative action, fine and/or imprisonment under Federal law. **Furthermore, if services provided in this report were provided or procured through the payment directly or indirectly of a kickback or where otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result**." (Emphasis added).

262.   On each cost report for each Fiscal Year from 2004 through the present,  the responsible officer of Broward Health was required to certify, in pertinent part, as follows:  "I hereby certify that I have read the above statement [paragraph above] and that I have examined the accompanying electronically filed or manually submitted cost report....and that to the best of my knowledge and belief, it [the cost report] is a true, correct, and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. **I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations**." (Emphasis added).

263.   Broward Health was required to certify that their filed cost reports were  (1)

truthful, i.e., that the cost information contained in the report is true and accurate, (2) correct, i.e., that the provider is entitled to reimbursement for the reported costs in accordance with applicable instructions, (3) complete, i.e., that the cost report is based upon all knowledge known to the provider, (4) **that the services provided in the cost report were not linked to kickbacks, and (5) that the provider complied with laws and regulations regarding the provision of health care services, such as the *Stark* and Anti-Kickback Statutes.**

264.    Broward Health was also required to disclose all known errors and omissions in its claims for Medicare reimbursement (including its cost reports) to its fiscal intermediary. 42 U.S.C. § 1320a-7b (a) (3) specifically confirms the duty to disclose known errors in cost reports. "Whoever....having knowledge of the occurrence of any event affecting (A) his initial or continued right to any such benefit or payment...conceals or fails to disclose such event with an intent fraudulently to secure such benefit or payment either in a greater amount or quantity than is due or when no such benefit or payment is authorized...shall in the case of such a ....concealment or failure...be guilty of a felony."

265.    In the months following the end of each fiscal year, Broward Health submitted annual cost reports to the Centers for Medicare and Medicaid Services (CMS) and attested to the certifications stated above. Broward Health has submitted cost reports with the certifications stated above for Fiscal Years 2004,

2005, 2006, 2007, 2008, 2009, 2010, and 2011.

266.   CMS issued a Notice of Provider Reimbursement (NPR) based on the financial data submitted in the cost reports by Broward Health for each Fiscal Year. In accordance with 42 C.F.R. § 415.1885, a cost report may be reopened within three (3) years of the Notice of Program Reimbursement date. The Federal regulations establish that the cost report may be reopened due to false claims or if the provider has provided inaccurate cost report data.

267.   After the submission of their cost reports each year to CMS, Broward Health had ongoing duties and opportunities to request the reopening of their previous cost reports which contained false information submitted to Federal healthcare programs.

268.   In addition to the in-patient fees billed by hospitals, physicians also separately bill for their services provided to Medicare patients under Part B. Physicians and physician groups submit Form CMS-1500 for this purpose.

269.   Form CMS-1500 requires the physician to certify that he or she "understand(s) that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws."

270.   By submitting CMS-1500 forms, physicians and physician groups certify that they are eligible for participation in the Medicare Program, and that they have

complied with all applicable regulations and laws governing the Program, such as the *Stark* and Anti-Kickback Laws.

## Introduction to Medicaid Program

271. The Medicaid Program is a joint federal-state program that provides health care benefits primarily for the poor and disabled. Medicaid is authorized under Title XIX of the Social Security Act and is administered by each State in compliance with Federal requirements specified in the Medicaid statute and regulations. "The States operate Medicaid programs in accordance with Federal laws and regulations and with a State plan that we approve." 66 Federal Register 857.

272. The Federal Medicaid statute sets forth certain minimum requirements for state Medicaid programs to qualify for federal funding, which is called federal financial participation (FFP). 42 U.S.C. §§1396, *et seq.* As part of such minimum requirements, each state's Medicaid program must cover hospital and physician services. 42 U.S.C. § 1396a (10)(A), 42 U.S.C. § 1396d (a)(1)-(2), (5).

273. The Federal matching rate for the Florida Medicaid Program was 61.88 percent in 2004, 58.90 percent in 2005, 58.89 percent in 2006, 58.76 percent in 2007, 56.83 percent in 2008, 67.64 percent in 2009, 67.64 percent in 2010, and 55.45 percent in 2011. www.statefhealthfacts.org.

274.   "Section 13624 of OBRA 1993, entitled 'Application of Medicare Rules Limiting Certain Physician Referrals,' added a new paragraph (s) to section 1903 of the Act, that extends aspects of the Medicare prohibition on physician referrals to Medicaid." 66 Federal Register 857. "This provision bars FFP in State expenditures for DHS furnished to an individual based on a physician referral that would result in denial of payment for the services under the Medicare program if Medicare covered the services to the same extent and under the same terms and conditions as under the State Medicaid plan." 66 Federal Register 858.

275.   "The statute also made certain reporting requirements in section 1877(f) of the Act and a civil monetary penalty provision in section 1877(g)(5) (related to reporting requirements) applicable to providers of DHS for which payment may be made under Medicaid in the same manner as they apply to providers of such services for which payment may be made under Medicare." 66 Federal Register 858.

276.   In Florida, provider hospitals participating in the Medicaid Program file annual cost reports with the state's Medicaid agency, or its intermediary, in a protocol similar to that governing the submission of Medicare cost reports. Medicaid providers must incorporate the same type of financial data in their Medicaid cost reports as contained in their Medicare cost reports.

277.   Within such Medicaid cost reports, hospitals must certify the accuracy of the information provided and certify compliance with Medicaid laws and regulations, including compliance with the *Stark* and Anti-kickback laws.

278.   The Florida Medicaid Program uses the Medicaid patient data in the cost reports to determine the payments due each facility.

279.   In the time period of 2004 through the present, Broward Health has derived revenue from the Medicaid Program in excess of one billion dollars.

280.   Defendants submitted claims to Medicaid that were based in part on their Medicaid cost reports and their false certifications of compliance with Federal *Stark* and Anti-Kickback Laws. The Florida Medicaid Program relied upon such certifications as mandatory conditions of payment before paying such claims submitted by Broward Health.

## **Introduction to TRICARE**

281.   Broward Health was also enrolled in and sought payments from the Civilian Health and Medical Program of the Uniformed Services, known as TRICARE Management Activity/CHAMPUS ("TRICARE/CHAMPUS").

282. TRICARE is a federally-funded program that provides medical benefits, including hospital services, to certain relatives of active duty, deceased, and retired service members or reservists, as well as to retirees. TRICARE sometimes provides for hospital services at non-military facilities for active duty service

members as well. 10 U.S.C. §§ 1071-1110; 32 C.F.R. § 199.4(a).  Broward Health

has received revenue from the TRICARE Program.

283.   In addition to individual patient costs, TRICARE pays hospitals for two

types of costs, both based on the Medicare cost report: capital costs and direct

medical education costs. 32 C.F.R. § 199.6.

284.   A provider seeking reimbursement from TRICARE for these costs is

required to submit a TRICARE form, "Request for Reimbursement of CHAMPUS

Capital and Direct Medical Education Costs" ("Request for Reimbursement"), in

which the provider sets forth the number of patient days and financial information

related to these costs. These costs are derived from the provider's Medicare cost

report.

285.   The Request for Reimbursement requires that the provider certify that the

information contained therein is "is accurate and based upon the hospital's

Medicare cost report."

286.   Upon receipt of a provider's Request for Reimbursement, TRICARE or its

fiscal intermediary applies a formula for reimbursement wherein the provider

receives a percentage of its capital and medical education costs equal to the

percentage of TRICARE patients in the hospital.

287.   Broward Health submitted Requests for Reimbursement to TRICARE that

were based on their Medicare cost reports. Whenever the Medicare cost reports of

Broward Health contained false information or false certifications from which they derived their Requests for Reimbursement submitted to TRICARE, those Requests for Reimbursement were also false.

288.   On each occasion when Broward Health's Requests for Reimbursement were false due to falsity in its Medicare cost reports, Broward Health falsely certified that the information contained in its Requests for Reimbursement was "accurate and based upon the hospital's Medicare cost report."

289.   Broward Health knew that false claims contained in their Medicare cost reports would affect TRICARE/CHAMPUS payments as well and result in damages to the federal government.[12]

## **Introduction to the False Claims Act**

290.   The False Claims Act establishes liability, *inter alia,* for anyone who "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A), or "knowingly makes, uses, or causes to be made or used, a false record or statement material[13] to a false or fraudulent claim," 31

---

[12]   Federal Healthcare Programs include patients covered under the Medicare, Medicaid, and Tri-Care Programs in addition to federal employees and retired federal employees.

[13]   "The term 'material' means having a natural tendency to influence. Or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. §

U.S.C. § 3729(a)(1)(B), or "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation[14] to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G).

291.   The False Claims Act defines "claim" to include "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that…is presented to an officer, employee or agent of the United States…or is made to a contractor, grantee or other recipient, if the money or property is to be spent on the Government's behalf or to advance a Government program, and if the United States Government…provides or has provided any portion of the money or property requested or demanded…or will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2).

292.   Statutory liability under the False Claims Act includes a civil penalty "not

---

3729(b)(4).

[14] The False Claims Act defines "obligation" as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3).

less than $5,500 and not more than $11,000" per false claim "plus 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a).

293.   Under the Federal False Claims Act, "'knowing' and 'knowingly' mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and require no proof of specific intent to defraud." 31 U.S.C. 3729 (b)(1).

294.   In considering the requisite scienter which subjects a defendant to liability under the False Claims Act, "no proof of specific intent to defraud" is required. *Id.* Under the False Claims Act, a defendant is liable for acting in "reckless disregard of the truth or falsity of the information" or acting in "deliberate ignorance of the truth or falsity of the information." *Id.*

295.   Protection of the public treasury requires that those who seek public funds act with scrupulous regard for the requirements of law. Participants in Federal Healthcare Programs have a duty to familiarize themselves with the legal requirements for payment and ensure compliance. A defendant who fails to inform himself of those requirements acts in reckless disregard or in deliberate ignorance of those requirements, either of which was sufficient to charge him with knowledge of the falsity of the claims in question.  Likewise, a defendant who fails to verify and

evaluate the accuracy of information or investigate the accuracy of information when on notice of questions concerning the accuracy of such information acts in reckless disregard or deliberate ignorance sufficient to charge him with knowledge of the falsity of the claims in question.

296.   The False Claims Act was amended pursuant to Public Law 111-21, the Fraud Enforcement and Recovery Act of 2009 (FERA), enacted May 20, 2009. "The amendments made by this section shall take effect on the date of enactment of the Act and shall apply to conduct on or after the date of enactment, except that (1) subparagraph (B) of section 3729 (a) (1), as added by subsection (a) (1) shall take effect as if enacted on June 7, 2008, and apply to all claims under the False Claims Act (31 U.S.C. § 3729) that are pending on or after date…" FERA, § 4(f). The conduct identified in this Third Amended Complaint occurred both before and after the enactment of FERA. The illegal conduct identified in this Third Amended Complaint spans Fiscal Years 2004-2011, is ongoing, and continues through the present at Broward Health.

297.   On March 23, 2010, the President of the United States signed the Patient Protection and Affordability Care Act, Pub. L. 111-148, 124 Stat. 119, which broadened the reach of the False Claims Act. Under the amended False Claims Act, the public disclosure defense is no longer a jurisdictional bar. Rather, it is an affirmative defense that automatically fails if opposed by the government.

298.   31 U.S.C. § 3730(4)(A), as amended in March of 2010, provides as follows,

> (4)(A) The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party; (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or (iii) from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.
> (B) For purposes of this paragraph, "original source" means an individual who either (i) prior to a public disclosure under subsection (e)(4)(A), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.

299.   Even in the presence of a public disclosure as defined in the amended False Claims Act, the complaint is not subject to dismissal if the whistleblower is an "original source."

300.   Under the amended False Claims Act, "original source" is redefined. Previously, an "original source" must have had "direct and independent knowledge of the information on which the allegations are based," *and* voluntarily provided the information to the Government before filing suit based on such information. As amended, an "original source" must either: (i) prior to a public disclosure, have voluntarily disclosed to the Government the information on which allegations or transactions in the claim are based, *or* (ii) have knowledge that is independent of,

and that materially adds to, the publicly disclosed allegations or transactions, and have voluntarily provided the information to the Government before filing an action.

301.  In this action there has been no public disclosure of the allegations or evidence of *Stark* Law violations presented in this Third Party Complaint as defined under the False Claims Act either before or after the Amendment of March 2010.  Dr. Reilly would satisfy the original source exception even if there was such a public disclosure.

302.  The evidence of *Stark* Law violations cited in by Dr. Reilly has not been publicly disclosed in any source listed under the False Claims Act or any other source. The extensive evidence of *Stark* Law violations identified in detail above derive from secretive internal reports kept and concealed by Broward Health and private communications and admissions of Broward Health officers.

303.  While North Broward Hospital District is subject to the "Florida Sunshine Law," Section 119 of Florida Statutes, the secretive Contribution Margin Reports and other evidence of *Stark* law violations cited above are not publicly available and have not been publicly disclosed. Broward Health's financial strategists have deliberately concealed such Contribution Margin Reports and other evidence of *Stark* law violations from public review.

304.   In filing this action and presenting the allegations of *Stark* law violations by Broward Health, Dr. Reilly has not used any evidence obtained under the Florida Sunshine Law from Broward Health.  Although Dr. Reilly has issued requests for records to Broward Health under Section 119 of Florida Statutes, such requests have been stonewalled by Broward Health under the guise of multiple legal objections.  Nor has Dr. Reilly used any evidence or information from the news media in filing this action and presenting the allegations of *Stark* law violations by Broward Health.

### Certifying Compliance with the Federal *Stark* Laws and Anti-Kickback Statutes Is Condition of Payment Under Federal Healthcare Programs and False Certifications are Actionable under the False Claims Act

305.   Federal law establishes that falsely certifying compliance with the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b (b), and *Stark* Statute, 42 U.S.C. § 1395nn, in a Medicare cost report is actionable under the False Claims Act. False claims to Medicare, including Medicare cost reports and UB-92s (also known as form "HCFA-1450"), are actionable under the False Claims Act. The submission of UB-92s in violation of the *Stark* Statute constitutes a violation of the False Claims Act.

306.   The *Stark* Laws state that compliance is a mandatory condition of Medicare payments. Likewise, compliance with the Anti-Kickback Statute is a mandatory condition of payment by the Medicaid Program. 42 U.S.C. § 1320a-7b (b).

307.   On their annual cost reports submitted to CMS for each of the fiscal years in question, the Broward Health Defendants have certified that none of the services billed Federal health care programs were "provided or procured through the payment directly or indirectly of a kickback." Each cost report states, **"If services identified in this report were provided or procured through the payment directly or indirectly of a kickback or where otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result."** (Emphasis added).

308.   For each Fiscal Year from 2004 through the present, the annual cost report was signed by a Broward Health officer or administrator who certified **"that I am familiar with the laws and regulations regarding the provision of health care services and that the services identified in this cost report were provided in compliance with such laws and regulations."** (Emphasis added). The certifications were a prerequisite to payment under Federal Healthcare Programs. Broward Health's express certifications were and continue to be knowingly false for the reasons stated in this Third Amended Complaint.

309.   The Broward Health Defendants have also violated the Federal False Claims Act through other certifications of compliance with the Anti-Kickback Laws and *Stark* Statute, which certifications are prerequisites to enrollment in Federal Healthcare Programs and Defendants' receipt of Medicare and Medicaid

payments.

310.   The enrollment application that providers must execute to participate in the Medicare program, Form CMS-855A, contains the following certification: "I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. **I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including but not limited to, the Federal anti-kickback statute and the Stark law),** and on the provider's compliance with all applicable conditions of participation in Medicare." (Emphasis added).

311.   After violating the Federal *Stark* and Anti-Kickback Laws, the Broward Health Defendants violated the Federal False Claims Act through their knowingly false express and implied certifications which were conditions of payment from Federal Healthcare Programs.

312.   For the time period of claims arising from Fiscal Years 2004, 2005, 2006, 2007, 2008, 2009, 2010, and 2011 through the present, the Broward Health Defendants have submitted thousands of claims to Federal Healthcare Programs which claims represent referrals from employed physicians receiving excessive compensation in violation of Federal *Stark* and Anti-Kickback Laws.

313.   As discussed in detail above, Broward Health has systematically tracked and monitored the value, volume, and identity of all claims which represent referrals from employed physicians to Broward Health hospitals and clinics. Broward Health is exclusively in possession of the entire body of evidence exposing their violations of *Stark* and Anti-Kickback laws.

314.   The Defendants are in possession of the Forms UB-92 (or Forms UB-04 used after March of 2007), Medicare Cost Reports and corresponding Medicaid or TRICARE forms used to make claims for services arising from referrals from employed physicians receiving commercially unreasonable compensation from Broward Health.

315.   Additionally, the Broward Health Defendants' certifications of compliance with Federal *Stark* and Anti-Kickback Laws were express conditions of all payments made by Federal Healthcare Programs between 2004 and the present.

### Model of Damages to the Federal Government

316.   In this same presentation by Mr. Ulery identified above, he indicated that 25 percent of physician revenues derive from the Medicare Program and 20 percent from Medicaid.[15] The Contribution Margin Reports for its physician groups in

---

[15]The Federal matching rate for the Florida Medicaid Program was 61.88 percent in 2004, 58.90 percent in 2005, 58.89 percent in 2006, 58.76 percent in 2007, 56.83 percent in 2008, 67.64 percent in 2009, 67.64 percent in 2010, and 55.45 percent in 2011. www.statefhealthfacts.org.

some years indicate percentages lower than Mr. Ulery's percentages. For example, in Fiscal Year 2011, among total net revenue for compensated care by employed physicians in the amount of $20,956,131, the Medicare Program paid $4,651,936 or 22 percent. The Medicaid Program paid $2,557,060 or 12 percent of total net revenues for physician services.

317.   According to Broward Health's Contribution Margin Reports for Fiscal Year 2009, among total reimbursement for employed physician services in the amount of $17,228,754, the Medicare Program paid $3,541,471 or 20 percent of total reimbursement for physician services.  The Medicaid Program paid $1,996,369 or 11 percent of total reimbursement for physician services.  The following calculations use these percentages of Medicare and Medicaid payments (31 percent) derived from net revenues for employed physician services.

318.  For Fiscal Year 2009 as of June, Broward Health calculated that its physician practice groups generated 3,171 inpatient referrals and 22,700 outpatient referrals. Using the percentage (31 percent) calculated above which represents Broward Health's internal report of the percent of Medicare/Medicaid payments for physician services in Fiscal Year 2009, 8,006 of these inpatient and outpatient cases represent tainted referrals of Medicare and Medicaid patients to Broward Health hospitals and clinics.

319.   Under the *Stark* laws, the entire payments from Federal Healthcare Programs

for the tainted admissions represent the principal damages to the United States. The Physician Contribution Margin Reports prepared by Broward Health track profits from inpatients and outpatient referrals by their employed physicians. The Contribution Margin Reports list profits but not total revenues associated with such referrals.

320.   By evaluating the Cost Reports submitted by Broward Health hospitals, the average revenues for each Medicare and Medicaid inpatient admission and outpatient visit can be determined and then applied to the Contribution Margin Reports' lists of inpatient and outpatient referral cases to arrive at total payment estimates for the tainted admissions at issue. Broward Health's Cost Reports indicate that its average Medicare payment per inpatient admission was $11,648.41 across all hospitals in Fiscal Year 2009 and its average Medicare payment for outpatient cases was $652.49 across all hospitals for Fiscal Year 2009.  Broward Health's cost reports indicate that its average Medicaid payment per inpatient admission was $12,011.28 across all hospitals in Fiscal Year 2009 and its average Medicaid payment for outpatient cases across all hospitals was $672.81 for Fiscal Year 2009.

321.   Using the actual average Medicare and Medicaid payments for inpatient and outpatient cases with respect to each of the Broward Health hospitals in Fiscal Year 2009, total principal damages to the Medicare and Medicaid Programs arising

in Fiscal Year 2009 from tainted referrals by the employed Physician Practice

Groups would equal approximately $18,435,700.

### Total Projected Principal Damages to the Medicare and Medicaid Programs Arising from Tainted Referrals from All Employed Physician Practice Groups for Fiscal Years 2004-2011

322.  For the time period of Fiscal Years 2004-2011 which represents eight fiscal

years, estimated principal damages to the Medicare and Medicaid Programs arising

from tainted referrals by all employed physician practice are $147,485,600. This

number was calculated by using the estimated principal damages from Fiscal Year

2009 arising from tainted referrals by all employed physician practice groups as

stated above and extrapolating that number for the entire eight year period. Treble

damages would equal $442,456,800.

323.  This number is an approximation. The United States may use a similar

model to calculate principal damages with more precision by using the exact

payments under the Medicare, Medicaid, and TRICARE Programs and payments

for medical care of federal employees and retired employees arising from referrals

by Broward Health physicians receiving excessive compensation for each year in

question.

### Potential Statutory Fines for the Tainted Claims

324.  For Fiscal Year 2009 as of June, Broward Health calculated that its

physician practice groups generated 3,171 inpatient referrals and 22,700 outpatient referrals. Using the percentages (20 percent and 11 percent) calculated above which represent an approximation of the percentages of Medicare/Medicaid patients, 8,006 of these inpatient and outpatient cases represent tainted referrals of Medicare and Medicaid patients to Broward Health hospitals and clinics.

325.   Applying the statutory penalty of $5,500 to $11,000 per case, potential penalties for Fiscal Year 2009 would range from approximately $44,033,000 to $88,066,000 for that single year. Projected over the eight year period, such fines would total between approximately $352,264,000 and $704,528,000.

### Summary of Damages Model Calculations

326.   For the time period of Fiscal Years 2004-2011 which represents eight fiscal years, estimated principal damages to the Medicare and Medicaid Programs arising from tainted referrals by all employed physician practice groups are approximately $147,485,600.   Treble damages would equal $442,456,800.   These estimates do not include damages to the TRICARE Program and federal health insurance programs for employees and retired employees.

327.   Applying the statutory penalty of $5,500 to $11,000 per case over the eight-year period, such fines would total between approximately $352,264,000 and $704,528,000.

**Count I---Federal False Claims Act 31 U.S.C. Section 3729(a)**
**(1)(A)**

328.   Relator repeats and realleges the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

329.   In pertinent part, the False Claims Act establishes liability for "any person who…knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A).

330.   The Broward Health Defendants knowingly or in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, presented or caused to be presented false claims "for payment or approval" to the United States in violation of 31 U.S.C. § 3729(a)(1)(A).

331.   This is a claim for treble damages and penalties under the Federal False Claims Act, 31 U.S.C. § 3729, et seq., as amended.

332.   Through the acts described above, the Broward Health Defendants knowingly or in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, presented or caused to be presented, false claims to officers, employees or agents of the United States Government, within the meaning of 31 U.S.C. § 3729(a)(1)(A).

333.   The United States was unaware of the falsity of the records, statements and claims made or caused to be made by the Broward Health Defendants. In reliance

on the accuracy of the claims, information, records, and certifications submitted by Broward Health, the United States paid and continues to pay claims that would not be paid if the Broward Health Defendants' unlawful conduct was known to the United States.

334.   As a result of the Broward Health Defendants' acts, the United States has sustained damages, and continues to sustain damages, in a substantial amount to be determined at trial.

335.   Additionally, the United States is entitled to a civil penalty of between $5,500 and $11,000 for each false claim made or caused to be made by Defendants arising from their unlawful conduct as described herein.

## Count II---False Claims Act 31 U.S.C. 3729(a)(1)(B) Use of False Statements

336.   Relator repeats and realleges the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

337.   In pertinent part, the False Claims Act establishes liability for "any person who…knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B).

338.   This is a claim for treble damages and penalties under the Federal False Claims Act, 31 U.S.C. § 3729, et seq., as amended.

339.   Through the acts described above, the Broward Health Defendants

knowingly made, used, or caused to be made or used, false records and statements, i.e., the false certifications made by the Broward Health Defendants in submitting their Cost Reports after each fiscal year to get false paid or approved by the United States.

340. Through the acts described above, the Broward Health Defendants knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to get false claims paid or approved, within the meaning of 31 U.S.C. § 3729(a)(1)(B).

341. The Broward Health Defendants made, used, or caused to be made or used false records or statements with the intent to get or cause these false claims to be paid by the United States.

342. The United States was unaware of the falsity of the records, statements, certifications, and claims made or caused to be made by the Broward Health Defendants. The United States paid and continues to pay claims that would not be paid if the Broward Health Defendants' unlawful conduct was known.

343. By virtue of the false records or false claims made by the Broward Health Defendants, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act to be determined at trial.

344. Additionally, the United States is entitled to civil penalties between $5,500 and $11,000 for each false claim made and caused to be made by the Broward

Health Defendants arising from their unlawful conduct as described herein.

## Count III---Federal False Claims Act 31 U.S.C. § 3729(a)(1)(C) Conspiring to Submit False Claims

345.   Relator repeats and realleges the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

346.   In pertinent part, the False Claims Act establishes liability for "any person who….conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G)." 31 U.S.C. § 3729(a)(1)(C).

347.   This is a claim for penalties and treble damages under the False Claims Act, 31 U.S.C. § 3729, et seq., as amended.

348.   Through the acts described above, the Broward Health Defendants, acting in concert with each other and other contractors, agents, partners, and/or representatives, conspired to knowingly present or cause to be presented, false claims to the United States and knowingly made, used, or caused to be made or used, false records and statements, and omitting material facts, to get false claims paid or approved.

349.   The Broward Health Defendants conspired to withhold information regarding excessive compensation to physicians and illegal incentives to physicians who were in a position to refer and/or influence referrals of Medicare, Medicaid, and TRICARE patients and federal employees or retired federal

employees to Broward Health.

350.   As a result, the United States was unaware of the false claims submitted and caused by Defendants and the United States paid and continues to pay claims that would not be paid if the Defendants' unlawful conduct was known to the United States.

351.   By reason of the Broward Health Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

352.   By virtue of Defendants' conspiracy to defraud the United States, the United States sustained damages and is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

### Count IV---Submission of Express and Implied False Certifications in Violation of 31 U.S.C. § 3729(a)(1)(B)

353.   Relator repeats and realleges the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

354.   In pertinent part, the False Claims Act establishes liability for "any person who…knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B).

355.   Compliance with *Stark* and Anti-kickback Laws were explicit conditions of

payment under Federal Healthcare Programs. For each of the years 2004-2011, Defendants certified compliance with Federal *Stark* and Anti-kickback Laws on their annual cost reports submitted to Federal Healthcare Programs.

356.   The Broward Health Defendants' certifications of compliance with Federal *Stark* and Anti-kickback Laws were knowingly false.

357.   In reliance on the Broward Health Defendants' express and implied certifications, the United States made payments to Defendants under Federal Healthcare Programs. If the United States had known that Defendants' certifications were false, Federal payments under the Federal Healthcare Programs would not have been made to Defendants for each of the years in question.

358.   By virtue of the false records, false statements, and false certifications made by the Broward Health Defendants, the United States sustained damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## Count V---Knowingly Causing and Retaining Overpayments in Violation of 31 U.S.C. § 3729(a)(1)(G)

359.   Relator repeats and realleges the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

360.   The False Claims Act also establishes liability for any person who "knowingly and improperly avoids or decreases an obligation to pay or transmit

money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). The False Claims Act defines "obligation" as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3).

361. "An entity that collects payment for [Designated Health Services] that was performed pursuant to a prohibited referral must refund all collected amounts on a timely basis." 42 C.F.R. § 411.353(d).

362. "The OIG may impose a penalty, and where authorized, an assessment against any person…whom it determines…[h]as not refunded on a timely basis….amounts collected as the result of billing an individual, third party payer or other entity for a [DHS] that was provided in accordance with a prohibited referral as described in [42 C.F.R. § 411.353]." 42 C.F.R. § 1003.102(b)(9).

363. Broward Health has knowingly caused and retained overpayments from Federal Healthcare Programs arising from Broward Health's violations of the *Stark* and Anti-Kickback Laws addressed above.

364. By virtue of Broward Health's causing and retaining overpayments from the Medicare Program, the Medicaid Program, and other Federal Healthcare Programs, the United States sustained damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500

to $11,000 for each violation.

## Count VI---False Claims Act 31 U.S.C. 3729 (a)(1)(G) False Record to Avoid an Obligation to Refund

365.   Relator repeats and realleges the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

366.   The False Claims Act also establishes liability for any person who "knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G).

367.   The Broward Health Defendants knowingly made and used, or caused to be made or used, false records or false statements, i.e., the false certifications made or caused to be made by Defendants in submitting the cost reports, to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States.

368.   By virtue of the false records or false statements made by the Broward Health Defendants, the United States sustained damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## Prayers for Relief

On behalf of the United States, Dr. Reilly requests and prays that judgment be entered against the Broward Health Defendants in the amount of the United

States' damages, trebled as required by law, such civil penalties as are required by law, for a qui tam relator's share as specified by 31 U.S.C. §3730, for attorney's fees, costs and expenses as provided by 31 U.S.C. §3730, and for all such further legal and equitable relief as may be just and proper.

**JURY TRIAL IS HEREBY DEMANDED.**

Respectfully submitted, this the ___ day of September, 2012.

Theodore J. Leopold (FBN 705608)
Leopold Law, P.A.
2925 PGA Boulevard, Suite 200
Palm Beach Gardens, FL 33410
561-935-4801- Telephone
561-515-1401 – Fax
TLeopold@leopold-law.com

Bryan A. Vroon, Esq. (Pro Hac Admission
Motion to be filed)
Georgia Bar No. 729086
Law Offices of Bryan A. Vroon, LLC
1718 Peachtree Street, Suite 1088
Atlanta, Georgia 30309
Telephone: (404) 607-6712
Facsimile: (404) 607-6711
bvroon@vroonlaw.com

Edward D. Robertson, Jr.
Anthony DeWitt
BARTIMUS, FRICKLETON,
ROBERTSON & GORNY, PC
715 Swifts Highway
Jefferson City, MO. 65109
573-659-4454 (Voice)

573-659-4460 (Facsimile)
(Pro hac vice motions to be submitted)

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this day served a copy of the within and foregoing Qui Tam Relator's Third Amended Complaint Under 31 U.S.C. §3729, Federal False Claims Act by depositing a true and correct copy of same by Certified Mail in the United States Mail, postage prepaid, addressed as follows:

The Honorable Attorney General Eric H. Holder
Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530-0001

The Honorable United States Attorney Wifredo A. Ferrer
United States Attorney for the Southern District of Florida
99 NE 4th Street
Miami Florida
33132

David T. Cohen, Esq.
Senior Trial Counsel
United States Department of Justice
601 D Street, NW, Room 9026
Washington, D.C. 20004

Mark Lavine, Esq.
Assistant United States Attorney for the Southern District of Florida
99 NE 4th Street
Miami Florida
33132

This __11__ day of September, 2012.

_____
Theodore J. Leopold